**FEDERAL TRADE COMMISSION,**
Plaintiff,

v.

**VERITY INTERNATIONAL,
LTD., et al., Defendants.**

**No. 00 CIV. 7422(LAK).**

United States District Court,
S.D. New York.

April 1, 2002.

Lawrence Hodapp, David M. Torok, Federal Trade Commission, Washington, DC, for Plaintiff.

John J.D. McFerrin–Clancy, Jeffrey M. Eilender, Schlam Stone & Dolan, New York City, for Defendants.

Beth E. Goldman, Assistant United States Attorney, James B. Comey, United States Attorney, New York City, for Amicus Curiae Federal Communications Commission.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This case concerns the provision of billing and other services to adult content Internet web sites. It has been the subject of several previous opinions and orders,[1] familiarity with which is assumed. The matter now is before the Court on the

---

1. See FTC v. Verity Int'l, Ltd., 124 F.Supp.2d 193 (S.D.N.Y.2000) ("Verity I"); see also FTC

FTC's motion to extend the existing preliminary injunction to a recently joined defendant, Automatic Communications Limited ("ACL"), and defendants' motion for judgment on the pleadings dismissing the complaint. In view of certain issues. raised by ACL, the Court has the benefit of an *amicus* brief filed on behalf of the Federal Communications Commission ("FCC").

## I.

ACL is an Australian company which, together with affiliates, has operated an Internet billing service for some time. Although there have been changes over time, the essence of the service has remained the same through the relevant period.

Defendants made available to their clients software that presented a computer user who accessed a client Internet web site[2] with a series of screens purportedly setting forth the terms and conditions of use of the site. If the user clicked a box stating "I agree," a dialer computer program supplied by defendants automatically downloaded to the user's computer, disconnected the user's modem from its ISP, and placed a call to a Madagascar telephone number assigned by Madagascar to ACL. ACL then "stopped" the call in the United Kingdom and reconnected it to the client web site, enabling the user to view the contents of the site. The subscriber of the line from which the call to the Madagascar number had been placed—who may or may not have been the person or entity that placed the call—then was identified through automatic number identification ("ANI") and billed for a purported international telephone call to Madagascar, although the charge in fact was that imposed for access to the contents of the site.[3] Defendants then divided the proceeds of the bills with the client web site operators in accordance with their contractual arrangements.

Beginning in January 1999, ACL had agreements with AT & T and, briefly, Sprint to handle the traffic and bill customers. In the summer of 2000, however, it chose to have the billing handled by its affiliate, Verity International, Ltd. ("Verity"). The switch over to Verity was a disaster,[4] and it led to the commencement of this action against, insofar as is relevant here, Verity and its principals, Robert Green and Marilyn Shein. The essence of the FTC's position is that (1) defendants' insistence that line subscribers are legally obligated to pay for access to these web sites where the line subscribers neither used them nor authorized such use, and (2) billing of calls "stopped" in the United Kingdom as calls to Madagascar both violated Section 5(a) of the Federal Trade Commission Act (the "FTC Act").[5]

On January 4, 2001, the Court granted the Commission's motion for a preliminary injunction and an asset freeze.[6] The complaint, however, was ambiguous as to whether it sought relief in respect of the period prior to Verity's commencement of billing. Accordingly, relief was limited to the Verity period.

---

*v. Verity Int'l, Ltd.*, No. 00 Civ. 7422(LAK), 2001 WL 504849 (S.D.N.Y. May 14, 2001); *FTC v. Verity Int'l, Ltd.*, 140 F.Supp.2d 313 (S.D.N.Y.2001); *FTC v. Verity Int'l, Ltd.*, No. 00 Civ. 7422(LAK), 2000 WL 1805688 (S.D.N.Y. Dec. 8, 2000).

**2.** Access typically involved use of the consumer's computer and modem, a telephone line, and an Internet service provider ("ISP"). *See Verity I*, 124 F.Supp.2d at 195.

**3.** *See id.* at 195.

**4.** *Id.* at 196–97.

**5.** 15 U.S.C. § 45(a).

**6.** Green and Shein have been held in civil contempt for violation of the injunction and apparently remain fugitives.

In March 2001, the FTC filed a second amended complaint, adding ACL as a defendant and expanded its claims to the period in which billing was done by AT & T and Sprint on behalf of ACL. The Commission then moved to extend the preliminary injunction to ACL, and defendants made related cross-motions. These motions have been resolved in all respects but one. The Court reserved the issue of the extension of the preliminary injunction to ACL [7] and conducted an evidentiary hearing on that subject on June 5, 2001.

## II.

Defendants move for judgment on the pleadings on four grounds. First, they maintain that ACL is a common carrier and thus outside the FTC's jurisdiction.[8] Next, they contend that the filed rate doctrine precludes line subscribers from disputing the charges at issue because they were imposed in accordance with tariffs filed with the FCC. Third, defendants argue that the FCC has primary jurisdiction over this case or, at least, certain issues it presents. Finally, they assert that the complaint does not plead fraud with the particularity required by Rule 9(b).

### A. FTC Act Jurisdiction

■ The FTC Act explicitly excludes from its coverage "common carriers sub-

ject to the Acts to regulate commerce."[9] It defines the Communications Act of 1934 ("Communications Act") as such a statute.[10] Some time in 1999, ACL applied to the FCC for authority under Section 214 of the Communications Act [11] to become a facilities- or resale-based international common carrier. It appears that the application was granted and a tariff filed shortly thereafter.[12] ACL contends that its activities therefore are beyond the reach of the FTC.

ACL's argument presupposes that once the FCC licenses an entity as a common carrier, it is a common carrier for all purposes and thus entirely beyond the reach of the FTC. But that premise is fundamentally erroneous. An entity that is a common carrier may engage in a broad range of activities, some integral to its functions as a common carrier and some entirely extraneous to them. Even where Congress commits regulation of common carrier activities to a particular agency, it would make little sense to exempt a carrier's extraneous activities from laws of general application affecting the broad sweep of American business. In fact, ACL has conceded that the Communications Act, as amended, specifically states that "a telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services." [13] Thus,

---

**7.** See Order, May 14, 2001, at 5.

**8.** This argument first was raised in ACL's reply memorandum and, by rights, should not be considered. See, e.g., Andrews v. Emerald Green Pension Fund, No. 98–436–P–H, 2000 WL 761672, at *5 n. 6 (D.Me. Mar. 29, 2000); United States ex rel Coleman v. Ryan, No. 97 C 2067, 1998 WL 292988, at * 14 n. 8 (N.D.Ill. May 28, 1998), aff'd, 196 F.3d 793 (7th Cir. 1999), cert. denied, 531 U.S. 848, 121 S.Ct. 120, 148 L.Ed.2d 75 (2000); Silver v. Countrywide Realty, Inc., 39 F.R.D. 596, 598–99 (S.D.N.Y.1966). Inasmuch as the issue is likely to recur, the Court instead has consid-

ered the FTC's supplemental submission in response to the belated contention and will address it now.

**9.** 15 U.S.C. § 45(a)(2).

**10.** Id. § 44.

**11.** 47 U.S.C. § 214.

**12.** See Eilander Reply Decl. Exs. 1 (notice of filing of application), 2 (ACL tariff).

**13.** ACL Mem. 16 (quoting 47 U.S.C. § 153(44)).

the better considered authorities, as well as the FCC, agree that whether an entity is a common carrier for regulatory purposes depends on the particular activity at issue.[14] In other words, an entity may be a common carrier within the meaning of the Communications Act for some purposes and not for others.[15]

To be sure, *FTC v. Miller*,[16] upon which ACL relies heavily, indicates otherwise. The Seventh Circuit there quashed FTC subpoenas served on a mobile home transporting company in an investigation of alleged unfair trade practices on the ground that the respondent operated under a certificate of convenience and necessity issued by the Interstate Commerce Commission and therefore was a common carrier exempt from FTC scrutiny under Section 5(a)(2) of the FTC Act.[17] Indeed, ACL goes on to point out that language in *Miller* to the effect that the Section 5(a)(2) exemption depends on the status of the party under scrutiny rather than its conduct was quoted by the Second Circuit in *Official Airline Guides, Inc. v. FTC* ("*OAG* ")[18] with apparent approval. But neither *Miller* nor *OAG* is persuasive here.

As far as *Miller* is concerned, it is inconsistent with common sense proposition that the carrier exemption to the FTC Act should be construed no more broadly than its purpose—to avoid interfering with the regulation of carriers by agencies to which their regulation is committed. There was no inherent inconsistency between ICC regulation of, for example, entry into and rates charged by interstate trucking companies and FTC investigation of their allegedly unfair trade practices. Hence, this Court, agrees with other courts and the FCC, which hold that the term "common carrier ... indicates not an entity but rather an activity as to which an entity is a common carrier."[19] Indeed, it must be borne in mind that *Miller* concerned the Interstate Commerce rather than the Communications Act. The Communications Act, as amended by the Telecommunications Act of 1996, specifically states that "a telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services,"[20] implying that an entity can be treated as a common carrier for certain activities and not as a common carrier for non-telecommunications activities.

14. *See, e.g., Computer & Comm. Ind. Ass'n v. FCC*, 693 F.2d 198, 209 n. 59 (D.C.Cir.1982) (using term "common carrier" to "indicate not an entity but rather an activity as to which an entity is a common carrier"), *cert. denied*, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983); *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 533 F.2d 601, 608 (D.C.Cir.1976) ("*Naruc II* "); *cf.* 47 U.S.C. § 153(10) (defining "common carrier" as any person "engaged as" a common carrier).

15. *S.W. Bell Tel. Co. v. FCC*, 19 F.3d 1475, 1480 (D.C.Cir.1994); *Naruc II*, 533 F.2d at 608; *In re Audio Comm., Inc.*, 1993 WL 525815, 8 FCCR 8697, at ¶ 12 (1993) ("The [FCC] has clearly established that a single firm that is a common carrier in some roles need not be a common carrier in other roles."); *see also FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 n. 9, 99 S.Ct. 1435, 59

L.Ed.2d 692 (1979) ("A cable system may operate as a common carrier with respect to a portion of its services only.").

16. 549 F.2d 452 (7th Cir.1977).

17. 15 U.S.C. § 45(a)(2).

18. 630 F.2d 920 (2d Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981).

19. *See Naruc II*, 533 F.2d 601, 608 (D.C.Cir. 1976); *In re Audio Communications, Inc.*, 8 F.C.C.R. 8697, ¶ 12 (1993) ("The [FCC] has clearly established that a single firm that is a common carrier in some roles need not be a common carrier in other roles.").

20. 47 U.S.C. § 153(44).

Nor is *OAG* of greater help to ACL. The Second Circuit there held that a company that published flight schedules was not exempt from the FTC Act under the exemption for air carriers equivalent to that for common carriers. Although some of the language suggests that status is more important than activity,[21] the case itself addresses whether an entity that is not a carrier falls into the exception when its activities are subject to regulation under the relevant act. In contrast, here the question is whether the activities—even those not regulated by the Communications Act—of an entity that is licensed as a carrier are beyond the scope of the FTC Act.[22] Moreover, underlying the reasoning in *Official Airline Guides* is a comparison of the "broad mandate given to the [Federal Trade] Commission to enforce section 5" with "the narrow exemption from the Commission's jurisdiction."[23] In these circumstances, these policies support a holding that ACL is not exempt.

This is precisely the conclusion advocated by the FCC, the agency charged with administration of the Communications Act, as *amicus*.[24] While not entitled to full *Chevron* deference, the FCC's informal

views on this subject certainly are entitled to some deference.[25] It points out that FCC regulations define a communication common carrier as "any person engaged in rendering communication service for hire to the public."[26] The regulation has been construed as establishing a two prong test determinative of common carrier status. First, the "primary *sine qua non* ... is a quasi-public character, which arises out of the undertaking to carry for all people indifferently."[27] The second is "that the system be such that customers 'transmit intelligence of their own design and choosing.' "[28]

■ ACL has described its business as being comprised of three activities: (1) obtaining the rights to certain telephone numbers in foreign countries, (2) licensing the use of those numbers to companies that market billing software to web site operators, and (3) agreeing with long distance carriers to terminate calls from the carriers' home countries to the numbers in foreign countries in respect of which ACL has acquired rights.[29]

■ These activities do not satisfy the test. As the FCC has said, "[t]he ultimate

**21.** See *Official Airline Guides*, 630 F.2d at 923 (quoting *Miller*, 549 F.2d at 455).

**22.** The other case on which defendants rely has the same limitation. See *FTC v. Saja*, No. Civ–97–0666–PHX–SMM, 1997 WL 703399, at *1 (D.Ariz. Oct. 7, 1997) (fundraising for not-for-profit organizations does not make an entity a nonprofit).

**23.** *Official Airline Guides*, 630 F.2d at 923.

**24.** Brief of Federal Communications Commission as *Amicus Curiae*, at 1–3, *FTC v. Verity Int'l, Ltd.*, 00 CV 7422(LAK) ("FCC *Amicus* Brief").

**25.** See, e.g., *United States v. Mead Corp.*, 533 U.S. 218, 233–35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *TeamBank, N.A. v. McClure*, 279 F.3d 614, 618–19 (8th Cir. 2002); *Matz v. Household Int'l Tax Reduction*

*Inv. Plan*, 265 F.3d 572, 573–74 (7th Cir. 2001), *cert. denied*, — U.S. —, 122 S.Ct. 1357, — L.Ed.2d — (2002); *Hall v. United States EPA*, 273 F.3d 1146, 1155–56 (9th Cir. 2001); *Commonwealth Edison Co. v. Vega*, 174 F.3d 870, 875 (7th Cir.), *cert. denied*, 528 U.S. 873, 120 S.Ct. 176, 145 L.Ed.2d 149 (1999).

**26.** 47 C.F.R. § 21.2 (2001).

**27.** *Naruc II*, 533 F.2d at 608 (internal quotation marks omitted); *accord, S.W. Bell Tel. Co.*, 19 F.3d at 1480.

**28.** *Naruc II*, 533 F.2d at 609 (quoting *Indus. Radiolocation Serv.*, 1966 WL 13821, 5 F.C.C.R.2d 197, 202 (1966)); *accord S.W. Bell Tel. Co.*, 19 F.3d at 1480.

**29.** Blanchard Reply Decl., Apr. 24, 2001, ¶ 3.

test is the nature of the offering to the public." [30] ACL does not claim to have held itself out to the public as an indifferent provider of telecommunications services. It was AT & T, and later Sprint, that provided long distance services to the public as common carriers. ACL did not set the rates, terms or conditions for those services. Nor did it physically do the billing. [31] Indeed, to whatever extent that ACL might have provided transmission services on a common carrier basis, it did so as a terminating carrier as agent for Telecom Malagasy. To that extent, it stood in the shoes of Telecom Malagasy and thus was a foreign terminating carrier rather than a common carrier subject to the FCC's jurisdiction. [32]

 ACL's contention that it is a reseller and therefore a common carrier also is without merit. As the FCC points out, resale is "an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications service and facili-

ties to the public (with or without 'adding value') for profit." [33] The only thing ACL resold was the right to terminate calls to certain Madagascar numbers. [34] Even this it did not sell to the general public—only to a limited group of providers to whom ACL licensed the Madagascar numbers it licensed from Telecom Malagasy.

For all of the foregoing reasons, there is no basis for concluding that the ACL activities at issue in this case are common carrier activities within the meaning of the Communications Act.

## B. Primary Jurisdiction

 The doctrine of primary jurisdiction allows a federal court to stay or dismiss a case that involves "technical and intricate questions of fact and policy that Congress has assigned to a specific agency," [35] here potentially the FCC. The doctrine "applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the [agency's] resolution of threshold issues." [36] This circuit has called the scope

---

30. *REGULATORY POLICIES CONCERNING RESALE AND SHARED USE OF COMMON CARRIER SERVICES AND FACILITIES ("Resale and Shared Use Order")*, 1976 WL 31603, 60 F.C.C.2d 261, ¶ 101 (1976), *modified by* 60 F.C.C.2d 588 (1976), *modified by* 61 F.C.C.2d 70 (1976), *aff'd on reconsideration*, 62 F.C.C.2d 588 (1977), *aff'd sub nom. AT & T v. FCC*, 572 F.2d 17 (2d Cir.), *cert. denied*, 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978).

31. *Cf. IN RE PHILIPPINE LONG DISTANCE TEL. CO. v. USA LINK, L.P.*, 1997 WL 458228, 12 F.C.C.R. 12,010, at ¶¶ 17–19 (1997).

32. *See* 47 U.S.C. § 152(a) (Communications Act applies "to all interstate and foreign communication by wire or radio … which originates and/or is received within the United States"); *Cable & Wireless P.L.C. v. FCC*, 166 F.3d 1224, 1229–30 (D.C.Cir.1999) (noting that FCC "claims no authority to directly regulate foreign carriers" and holding that order did not violate Communications Act because

it did not regulate foreign carriers or foreign telecommunications).

33. *RESALE AND SHARED USE ORDER*, 60 F.C.C.2d at ——, at ¶ 17; *see also National Communications Ass'n, Inc. v. AT & T*, 46 F.3d 220, 221 (2d Cir.1995) (defining reseller as "one who engages in the business of purchasing long-distance telecommunications services at large-volume rates from a supplier, such as AT & T, and resells those services to others whose volume of use individually would not qualify them to purchase directly from the supplier").

34. *See* Tr., June 5, 2002, 135 ("ACL basically was a seller of the 2617 termination"); Blanchard Reply Decl. Ex. 3 (co-carrier interconnection agreement, not contract to purchase bulk AT & T services).

35. *Nat'l Communications Ass'n, Inc. v. AT & T*, 46 F.3d at 223.

36. *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58–59 (2d Cir.1994).

of the doctrine "relatively narrow," [37] and courts typically have deferred to agencies in actions that involved the validity of a rate or practice related to a tariff filed with an agency [38] or technical issues of fact.[39]

■ ACL argues that the Court should defer to the FCC in part because the case raises issues including whether ACL is a common carrier and whether the filed rate doctrine applies to the activities here at issue. But resolution of such questions by courts is routine.[40] The more interesting issue is whether ANI billing for videotext is a deceptive trade practice in these circumstances.

The threshold question is whether the FCC has authority over this issue.[41] The

Communications Act gives the FCC authority over "all interstate and foreign communication by wire or radio." [42] The agency has jurisdiction over common carriers and ancillary jurisdiction that permits it to take what actions are necessary to exercise its functions.[43] In other words, regardless of whether ACL is a common carrier, it is fairly clear that the issue is within the FCC's jurisdiction.[44] AT & T and Sprint are certainly common carriers, and ANI billing is a concern for telecommunications services. Moreover, although the FCC has left "enhanced" or "information" services essentially unregulated, it retains jurisdiction over them.[45]

■ That the FCC appropriately might reach the issues here does not necessarily

**37.** *Goya Foods, Inc. v. Tropicana Prods., Inc.,* 846 F.2d 848, 851 (2d Cir.1988).

**38.** *E.g., Tex. & P. Ry. Co. v. Am. Tie & Timber Co.,* 234 U.S. 138, 146, 34 S.Ct. 885, 58 L.Ed. 1255 (1914) (whether railroad ties could be shipped under a "lumber" tariff should be decided by the ICC rather than the court); *Danna v. Air France,* 463 F.2d 407, 409–11 (2d Cir.1972) (claim under the Federal Aviation Act that challenged the reasonableness and discriminatory effect of an airline tariff was a question for the Civil Aeronautics Board).

**39.** *E.g., Johnson v. Nyack Hosp.,* 964 F.2d 116, 122 (2d Cir.1992) (New York Public Health Council should decide whether there was a sound medical reason for hospital to terminate physician's privileges to perform thoracic and vascular surgery).

**40.** *See, e.g., Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC,* 525 F.2d 630, 642 (D.C.Cir.) (*"Naruc I "*) (defining common carrier), *cert. denied,* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976); *Naruc II,* 533 F.2d at 608 (same); *Marcus v. AT & T,* 138 F.3d 46, 58–59 (2d Cir.1998) (applying the filed rate doctrine).

**41.** *E.g., Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.,* 84 F.3d 91, 97 (2d Cir.1996) (as a threshold matter, court applying primary jurisdiction reasoning must de-

termine that the agency has jurisdiction over the issue).

**42.** 47 U.S.C. § 152(a).

**43.** *Id.* § 208(a) (FCC has jurisdiction over "anything done or omitted to be done by any common carrier" subject to the Communications Act); *id.* § 154(i) ("The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions."); *see* PETER W. HUBER ET AL., FEDERAL TELECOMMUNICATIONS LAW § 3.3.2, at 221 (2d ed. 1999 & Supp.2001) (explaining that FCC's jurisdiction is not limited to any particular technology because of its "ancillary jurisdiction," which is rooted in Section 154(i) of the Communications Act).

**44.** *Cf. LO/AD Communications, B.V.I., Ltd. v. MCI WorldCom,* No. 00 Civ. 3594(JGK), 2001 WL 64741, at *5 (S.D.N.Y. Jan. 24, 2001) (holding that the regulation of audiotext services is within the FCC's authority).

**45.** *See In re Second Computer Inquiry,* 77 F.C.C.2d 384, 432, ¶ 124 (1980), *reconsidered by* 84 F.C.C.2d 50 (1980), *further reconsidered by* 88 F.C.C.2d 512 (1981), *aff'd sub nom. Computer & Communications Indus. Ass'n v. FCC,* 693 F.2d 198 (D.C.Cir.1982), *cert. denied,* 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983).

mean that this Court should defer to it. Primary jurisdiction analysis is not an exact science, but courts in this circuit generally have considered the following factors: whether an issue is within the conventional experience of judges or instead involves technical or policy determinations within the agency's particular field of expertise, whether the issue is particularly within the agency's discretion, whether there is a substantial danger of inconsistent rulings and whether prior application to the agency has been made. Finally, courts weigh the advantages of applying the doctrine against the potential costs of complications and delay resulting from the administrative proceedings.[46]

These factors weigh against staying or dismissing this action. First, it does not involve a technical determination within the FCC's particular domain in that there are many precedents on application of the "enhanced" versus "basic" or the "information" versus "telecommunications" divide. Even when the interpretation of a tariff is involved, if an agency has already construed the tariff or "clarified the factors underlying it," a court rather than the agency appropriately might address the issue.[47]

Second, courts usually have described an issue as within an agency's particular discretion when it involves evaluating the reasonableness of a tariff or related practice.[48] Here there is no comparable exercise of discretion.

Third, the danger of inconsistent rulings is not substantial in that any decision will be fact-dependant and will not concern ANI billing in general but rather will be limited to ANI billing for videotext with bills similar to those here.

Finally, a deferral to the FCC would cause unnecessary delay.

The FCC, as *amicus*, agrees. It does not believe that its special expertise would be helpful, as the issue here is whether ACL's role in a billing scheme was a deceptive trade practice within the meaning of the FTC Act.

## C. Filed Rate Doctrine

■ Whether the filed rate doctrine applies is at the heart of defendants' potential liability and is addressed in detail in *Verity I*.[49] Essentially, defendants argue that the services at issue are telecommunications services rather than information services and that the filed rate doctrine therefore applies, making the representation that line subscribers were legally obligated to pay their bills accurate rather than misleading or deceptive.

Defendants add little new beyond citation to the FCC's statement in *IN RE FEDERAL–STATE JOINT BOARD ON UNIVERSAL SERVICE*,[50] which held that information service providers would not be treated as common carriers[51] but that an entity is deemed to provide telecommunications when it "provides a trans-

---

**46.** *See Nat'l Communications Ass'n,* 46 F.3d at 222–23.

**47.** *United States v. W. Pac. R. Co.,* 352 U.S. 59, 69, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *see also Duffy v. BMC Indus.,* 938 F.2d 353, 357 (2d Cir.1991) (calling "unexceptional" the proposition that "a court need not refer a tariff construction issue to the Commission if the Commission has previously construed the particular tariff").

**48.** *E.g., Danna v. Air France,* 463 F.2d 407, 410, 412 (2d Cir.1972).

**49.** *See Verity I,* 124 F.Supp.2d at 200–02.

**50.** 13 F.C.C.R. 11,501 (1998), *available at,* 1998 WL 166178.

**51.** *Id.* ¶ 60 (making "clear that offerings by non-facilities-based providers combining communications and computing components should always be deemed enhanced").

parent transmission path [that] does not 'change ... the form and content' of the information."[52] Defendants argue that ACL merely provided a transparent path for information and therefore offered telecommunications service. The difficulty is that ACL is analogous neither to an ISP nor to a facilities-based common carrier like AT & T. The FCC's statement reaffirmed the mutually exclusive nature of telecommunications and information services.[53] It was concerned with identifying which type of service was provided by ISPs and common carriers like AT & T that connect with ISPs and/or provide both lines and information services.

Taking the factual allegations in the FTC's complaint as true, as the Court must for this motion, ACL did not merely provide a transparent transmission path. The FTC alleges that it supervised dialer disclosures, arranged to stop calls in London, and connected the consumers' modems to the Internet, which would mean it was providing some combination of computing and communications services, placing it in the category of enhanced services. Accordingly, defendants have not shown that plaintiff can prove no set of facts in support of its claim that would entitle it to relief.

Once again, the FCC has supported the FTC's position. It points out that the issue here is not the validity, direct or indirect, of the tariffs applied and that ACL does not appear to be a common carrier. In consequence, it views the filed rate doctrine as affording ACL no shield against the FTC's deceptive trade practices charge.[54]

In a related argument, advanced in a footnote, defendants request dismissal for lack of subject matter jurisdiction.[55] They reason that, because the filed rate doctrine applies, those who used the service did not suffer any injury and that "their surrogate" the FTC therefore did not suffer an injury. Thus, defendants argue, the FTC lacks standing and the Court lacks subject matter jurisdiction.

 Dismissal on these grounds would be inappropriate for several reasons, including the fact that the plaintiff is the FTC rather than a private plaintiff and a decision on standing would merge with decision on the merits. But they need not be considered in detail as "[t]he determination of whether Article III standing exists ... must comport with the 'manner and degree of evidence required at the successive stages of the litigation.'"[56] On a motion for judgment on the pleadings, the facts averred by the plaintiff must be taken as true for purposes of the standing inquiry. Given this standard, the FTC clearly has alleged sufficient injury.

### D. Rule 9(b)

Defendants' Rule 9(b) argument—that the FTC is making a claim of fraud and that fraud must be pled with particularity—is without merit.[57] The second amended complaint sufficiently details who, what, when, where and how, identifying ACL and describing its relationship to the other defendants, describing the billing system, and specifying the time period.[58]

---

52. *Id.* ¶ 41 (alteration in original).

53. *See id.* ¶¶ 13, 39, 57.

54. FCC *Amicus* Brief, at 6.

55. *See* ACL Mem. 15 n. 26.

56. *E.g., Lerman v. Bd. of Elections,* 232 F.3d 135, 142 (2d Cir.2000) (quoting *Lujan v. De-* *fenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

57. Defendants raise this argument in the context of both motions addressed in this opinion. For the reasons here described, it is without merit in either context.

58. Second Am. Compl. ¶¶ 6, 9–10, 13–18, 22.

## III. *Extension of the Preliminary Injunction to ACL*

■ The second motion before the Court is to extend the preliminary injunction to ACL. The FTC may obtain a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." [59] The standard differs from that applicable to private applicants for such relief in that the FTC does not have to show irreparable harm,[60] but the Court must (1) determine that the FTC has a fair and tenable chance of ultimate success on the merits [61] and (2) consider the equities.[62]

■ ACL's principal argument against the FTC's application is simplicity itself: All the billing was done by AT & T. ACL had nothing to do with it. "Any potential liability for misrepresentations included on AT & T bills lie [*sic*] solely with AT & T." [63] With all due respect, the likelihood of ACL avoiding liability on that basis is right up there with the chance of the sun rising in the west.

### A. *The AT & T Connection*

The scheme here at issue—the creation and marketing to web site operators of a system for using ANI billing to bill and collect for their wares, a system that appears to have included deceiving telephone line subscribers into believing that they are liable even for unauthorized use of their telephone lines to access Internet-borne pornography—has been the project of Robert Green and Marilyn Shein, both of whom have been held in contempt and are fugitives. ACL, like Verity, is simply one of the corporate vehicles they have employed [64] to perpetrate what, at first blush at least, seems in part to have been a very substantial swindle.[65] The fact is that the gravamen of the FTC's case is that the billing for access to the web sites *as if* the bills were for telephone service in some cases took advantage of consumers' well founded belief that they are responsible for paying for *telephone calls* made on their lines regardless of who made them— a premise that does not apply to services of the sort provided by ACL's customers. Thus, according to the FTC, ACL sought to benefit from a false impression created by the fact that it chose AT & T to do the billing. For ACL now to suggest that it has no liability because it arranged to have the bills printed, mailed and collected by AT & T is remarkably audacious—and remarkably devoid of merit—whether AT &

---

**59.** 15 U.S.C. § 53(b).

**60.** H.R. Conf. Rep. No. 93–624, at 18 (1973), *reprinted in* 1973 U.S.C.C.A.N. 2523, 2533 ("The intent is to maintain the statutory or 'public interest' standard which is now applicable, and not to impose the traditional 'equity' standard of irreparable damage, probability of success on the merits, and that the balance of equities favors the petitioner."); *FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir.1999).

**61.** *See United States v. Sun & Sand Imps., Ltd.*, 725 F.2d 184, 188 (2d Cir.1984); *FTC v. Lancaster Colony Corp.*, 434 F.Supp. 1088, 1090–91 (S.D.N.Y.1977).

**62.** *See Verity I*, 124 F.Supp.2d at 199–200; *Lancaster Colony Corp.*, 434 F.Supp. at 1096

("The equities to be weighed ... are not the usual equities of private litigation but public equities.") (citing *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1344 (4th Cir.1976)).

**63.** ACL Opp. Mem. 14.

**64.** ACL was primarily owned and controlled by Green and Shein until September 2000, the entire period for which ACL's conduct is challenged by the Commission. Each owned 40 percent of ACL through other corporations. PX 143, at 33–34

**65.** Of course, it appears that at least some of the consumers who received bills knew what they were getting into and were not deceived.

T was a witting or an unwitting participant.

Further, ACL's attempt to cast blame on AT & T—which would not exculpate ACL even if AT & T also were culpable— is not very promising. The pivotal question in this regard is what AT & T knew and when it knew it—in other words, whether AT & T, when it billed consumers for telephone calls to Madagascar, knew that the consumers were really being asked to pay for access to web sites— videotext services—rather than simply telephone calls. This is critical because telephone subscribers are liable for any telephone calls made on their lines, regardless of who made or authorized them, but they are not liable for unauthorized use of those lines for videotext services. Evaluating this question requires consideration of the history of ACL's relationship with AT & T.

### 1. ACL's Agreement with Telecom Malagasy

The parties agree, for the purposes of this motion, that ACL entered into an agreement with Telecom Malagasy ("TM") in May 1997 in which TM assigned ACL the exclusive right to carry and terminate telephone calls to a range of numbers assigned to TM by international telephone authorities. TM directed all originating countries to make accounting payments for traffic on those numbers to ACL and to transmit or terminate all of the traffic on those numbers according to ACL's instructions.[66] ACL then contracted with information providers ("IPs") for the right to include the Madagascar numbers in their billing systems.[67]

### 2. The Contract Between ACL and AT & T

It is undisputed also that ACL, AT & T and AT & T U.K. (now Viatel) entered into an agreement in January 1999 for the carriage and termination of traffic to the Madagascar numbers assigned to ACL.[68] During a sixteen-month period, AT & T billed $30,618,447, from which it deducted charge backs of $11,268,778. The calls were billed according to AT & T's tariff filed with the FCC.[69]

ACL first argues that the contract with AT & T put AT & T on notice of what ACL was doing right from the outset. The contract refers to "switched voice services" between the United States and Madagascar and describes ACL as "hold[ing] a limited telecommunication license in Madagascar to terminate audiotext calls only."[70] It defines "Audiotex Calls" as "calls placed to telephone numbers in Operating Territory that are advertised or promoted in the U.S. for entertainment, fundraising or information provision purposes" by ACL or a third party who is compensated by ACL.[71]

Defendants promote a definition of audiotext that encompasses videotext, the material here involved, arguing from this premise that AT & T must have known what was going on.[72] It is unnecessary, however, to decide whether defendants' proposed definition is plausible, at least in some circumstances. The testimony of Stephen Bevens and John Ault, formerly

---

66. Stipulation of Agreed Facts ("Stip.") ¶¶ 2–4.

67. ACL Opp. Mem. 8.

68. Stip. ¶ 35; DX 6.

69. PX 128 ¶ 4.

70. DX 6 pmbl.

71. *Id.* ¶ 8.c.

72. Tr., June 5, 2001, at 58 (audiotext "[i]n its broadest sense" encompasses data traffic).

of AT & T and AT & T (U.K.), respectively, which the Court credits in this regard, makes it clear that the contract itself did not give AT & T notice that AT & T would be carrying and billing for videotext. Bevens testified at the June 5 hearing that when the service initially was negotiated, it was for voice services only and included no reference to videotext.[73] Ault, who signed the contract for AT & T (U.K.),[74] stated in his May 2001 declaration that he discovered that AT & T would be carrying data transmissions and not audiotext during the contractual relationship, implying that the contract had not made it clear.[75]

### 3. AT & T Discovers It Was Carrying Videotext

That the contract did not put AT & T on notice of the nature of ACL's activities does not answer the question of when AT & T tumbled to the nature of the traffic it was carrying. ACL claims that even if AT & T did not know from the contract itself, it learned that ACL was carrying videotext by virtue of explicit conversations and the fact that traffic was moved to uncompressed lines in January or February 2000. It relies principally upon testimony of Bevens and Ault.

In a May 2001 declaration, Bevens indicated that he spoke with Fox in January 2000 about the arrangement of Global Internet Billing ("GIB"), an information provider that marketed a dialer billing program with ACL's numbers, to terminate its traffic at ACL's Madagascar exchange numbers. Knowing that GIB's business was to sell dialers to information providers, he then realized, he claims, that AT & T was carrying videotext. In the same declaration, he says he spoke in February 2000 with AT & T's Consumer, Security and Public Relations divisions about AT & T transmission of data to the Madagascar numbers.[76] Moreover, he suggested that AT & T's security routinely tested suspect number ranges and, given the duration of calls, non-compressed lines, and modem sounds—all characteristic of data traffic— knew independently of these conversations that data was being transmitted.[77]

Bevens' testimony is not credible on this point. In his deposition, he testified that defendants never told him that they were beginning to offer videotext services,[78] that he and the defendants had discussed the appropriate disclosure for voice services only, and that neither he nor, to his knowledge, others at AT & T were aware that calls were being placed by a dialer program and were being short-stopped in the U.K.[79] The only reason he cited for this change between the deposition and the declaration was that he had had conversations with Ault, an employee, and defendants' lawyers.[80] Moreover, Bevens testified at the hearing that the conversation with Fox of GIB in which she made clear that data was being transmitted occurred shortly after he sent a letter to the telecom administration in Vanuatu, apparently another common destination for this type of traffic.[81] This letter was written on March

---

73. *Id.* at 104–05.

74. DX 6, at 14.

75. DX 26 ¶ 3.

76. *See* DX 23 ¶¶ 4, 5.

77. *See id.* ¶ 6.

78. Defendants quibble that Bevens did not know when they *began* to offer videotext services but knew soon after, but the Court finds, especially in light of the follow up questions, that his answer should be understood more broadly.

79. PX 150, attach. C, at 19, 27–28, 67.

80. Tr., June 5, 2001, at 86–87.

81. Tr., June 5, 2001, at 98–99.

23, 2000.[82]

Nor is Ault's testimony any more persuasive on the timing issue. At the June 5 hearing, he described a surge in call volume that he thought probably occurred in February 2000 and that caused deterioration in call quality.[83] He testified that several conversations took place around that time with Green and AT & T (U.K.) personnel about the fact that data was being transmitted, but was unable to point to an event that coincided with the commencement of the discussions about data compression. When confronted with documentary evidence suggestive of a later date, however, he acknowledged that the conversations he referred to could have occurred in April.[84] His May 3, 2001, declaration is consistent with either version, as he there claimed that AT & T knew it was carrying videotext communications, but did not discuss timing.[85]

The e-mails shown to Ault are the most reliable evidence of the timing. They were sent on April 3 and 4, 2000 by Green and employees of AT & T, Viatel and GIB. An e-mail sent by Marilyn Fox of GIB on April 3, 2000, indicated that she had had a conversation with Ault about finding uncompressed lines for the Madagascar traffic.[86] On April 4, 2000, Stephen Kaczmarek of Viatel wrote to Ault about such routes and Green forwarded this e-mail to Fox, who replied to Bevens and Kaczmarek that the proposal "will help the data traffic flow." [87]

In all the circumstances, the Court finds that AT & T did not discover the nature of the traffic that it was carrying for ACL until some time in or after the first week in April, following which it promptly terminated ACL's contract.

## B. Discussion

### 1. Likelihood of Success

The Court already has held the FTC has a fair and tenable chance of ultimately showing that ANI billing without an appropriate agreement with the line subscriber billed violates the FTC Act.[88] The jurisdictional and related defenses discussed above are unlikely to prove meritorious. The evidence at this stage indicates that ACL supervised website disclosures and contracted with dialer providers.[89] This amounts to more than mere provision of access to information, as defendants claim, and the FTC has a fair and tenable chance of showing that the services at issue were enhanced rather than basic.

The issue, then, is whether the FTC is likely to show that ACL is responsible for this billing. From what has been said already, that is quite probable.

82. AT & T Ex. O.

83. Tr., June 5, 2001, at 54.

84. *Id.* at 71.

85. DX 26 ¶¶ 3–5.

86. DX 12.

87. AT & T Ex. N.

88. *Verity I*, 124 F.Supp.2d at 199–204.

89. *See* Blanchard Reply Decl. ¶ 7 (indicating that ACL's agreement with GIB is a "standard contract with an IP"); *id.* Ex.2 (same contract with GIB made in name of Western Connections Ltd. ("WCL") and indicating that WCL acts as a broker of "audiotex services" and provides equipment and facilities to support those services); PX 150, attach. A, at 23–24 (proposed addendum to GIB–WCL agreement submitted by "Marilyn" on ACL letterhead, requiring clients to provide WCL with "necessary disclaimers that will appear to the user of such programs"); PX 143, at 38 ("[WCL] does not trade and simply holds the relevant contracts with the IPs. Notwithstanding these contracts are held by WCL all payments made to IPs are transacted and recorded in ACL.") (KPMG expert report).

For one thing, ACL shared the responsibility for billing during the Verity period. Green and Shein are or, at least, were the principals in both Verity and ACL. In the relationship with Integretel and its subsidiary eBillit, ACL and Verity were used interchangeably, with Verity substituted for ACL on the contracts at the last minute.[90] Similarly, when employees of GIB spoke with Green and Shein, it was not clear whether they were representing ACL, Verity, or Western Connections Limited, another corporation controlled by them.[91]

Moreover, based on the finding that AT & T, which performed the actual ANI billing for that early period, did not discover that it was carrying videotext until March or April 2000, the FTC is likely to succeed in showing that ACL had AT & T carry videotext and use ANI to bill consumers for this videotext without its knowledge for at least part of the pre-Verity period at issue. ACL contracted with videotext dialer providers, particularly GIB, with this purpose. The effort to shift responsibility to AT & T is weak also as regards the claim that AT & T "knowingly supplied its CIC number" to the dialer programs, not only because the CIC number is widely available, but also because it was made available to ACL for the purposes of their contract.[92]

### 2. Equities

The reasoning of the Court's initial preliminary injunction opinion applies with equal force here.[93] The only difference lies in the fact that fifty percent of ACL now is owned by Oriel Communications, Ltd. ("Oriel"), a publicly traded Australian corporation with more than four thousand shareholders.[94] After emerging from bankruptcy proceedings, it acquired its interest in ACL on September 20, 2000. At that point, Green and Shein each went from owning forty percent[95] to owning twenty percent of ACL.[96]

The effect on Oriel's shareholders certainly is a concern, but it is mitigated by the fact that defendants are not enjoined from billing for their services in any form but can continue to bill with certain disclosures and notices to the line subscribers. Although Craig Burton, the Executive Director of Oriel, indicated that the extension of the injunction to ACL would "inflict substantial damage on Oriel,"[97] Mark Blanchard, a director of ACL originally from Oriel, was equivocal about the effects that an asset freeze on ACL would have on

---

90. PX 150, attach. B, at 604 (e-mail from Green to Greg Calgano) ("Our accountants have advised us to put the billing into one of our subsidiary companies.... [P]roduce the contract in the name of 'Verity International Ltd.' (VIL) and we can sign it today."); PX 150, attach. C, at 67–68 (drafts of contracts were in ACL's name).

91. DX 32, at 86–88. Further blurring the lines between these corporate entities, WCL held the contracts with IPs, while all payments under these contracts were transacted and recorded in ACL. PX 143, at 38 (KPMG expert report).

92. Tr., June 5, 2001, at 102.

93. *Verity I*, 124 F.Supp.2d at 203.

94. *See* Stip. ¶¶ 5, 8.

95. The stipulation of agreed facts for the preliminary injunction hearing (paragraphs 14 and 19) conflicts with the application for ACL's 214 certificate, which lists Shein and Green as having fifty percent each, but the exact percentage is not crucial to this decision.

96. Green and Shein are each eleven percent shareholders of Oriel. Green was a director of Oriel from August 18, 2000 to March 16, 2001, and Oriel's chairman of the board on October 27, 2000. Stip. ¶¶ 6, 7, 16, 21.

97. Burton Decl. ¶ 5.

Oriel. He testified at the June 5 hearing that it would "have an impact on Oriel, but, you know, we've just bought some further businesses in Oriel."[98] The damage to Oriel's shareholders is also offset in part by the renegotiation of the price Oriel paid for ACL. Initially it was to pay $8 million followed by another $4 million six months later.[99] When the Court entered a temporary restraining order against Verity and the individual defendants, Oriel renegotiated so that the second payment was reduced in amount and made contingent on future profits.[100] In all the circumstances, the equities weigh in favor of extending the preliminary injunction to ACL.

### 3. Delay in Seeking the Preliminary Injunction

■■■■■ Defendants concede that the government generally is not subject to the defense of laches, but argue nonetheless that the FTC has waived the right to obtain a preliminary injunction against ACL because its delay in doing so has prejudiced Oriel, which invested in ACL.

The Second Circuit generally has followed *United States v. Summerlin*,[101] in which the Supreme Court held that the defense of laches is not available against a government entity.[102] The Court need not decide whether there are exceptions, as defendants argue, because even if laches were applicable, the defense would be without merit here.

■■■■■ "A party asserting the defense of laches must establish that: (1) the plaintiff

knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay."[103] Here, prejudice is lacking because ACL and Oriel were on notice (with Green and Shein informed as to Verity), and Oriel was able to renegotiate the price it paid for ACL. Moreover, the FTC sought to extend the preliminary injunction six months after the case was filed and one month after adding ACL as a defendant. There was no inexcusable delay and no waiver.

### 4. Liability for Redress

■■■■■ Defendants contend also that an asset freeze would be "legally unsupportable" because the FTC cannot obtain the restitutionary relief it ultimately seeks.[104] Defendants' argument, however, is without merit.

Contrary to defendants' argument, *FTC v. Five–Star Auto Club, Inc.*,[105] does not stand for the broad proposition that "the FTC [can] only obtain restitution from a particular defendant up to the amount of actual funds that the defendant received from illegal activities."[106] In that case, the court found that Angela Sullivan, the wife of the primary individual defendant, Michael Sullivan, was not personally involved in creating and disseminating the deceptive materials in issue and performed only ministerial tasks for the corporate defendant.[107] In light of this finding, the court limited Mrs. Sullivan's liability for consumer redress to the amount by which

---

**98.** Tr., June 5, 2001, at 145.

**99.** Burton Decl. ¶ 8.

**100.** *Id.* ¶ 13.

**101.** 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940).

**102.** *E.g., United States v. RePass*, 688 F.2d 154 (2d Cir.1982).

**103.** *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir.1998).

**104.** ACL Opp. Mem. 17.

**105.** 97 F.Supp.2d 502 (S.D.N.Y.2000).

**106.** ACL Opp. Mem. 17; *see also* Verity Opp. Mem. 10.

**107.** *Five–Star Auto Club*, 97 F.Supp.2d at 539.

she had benefitted from the challenged activity.[108] In contrast, the court held the corporate defendant liable for the full amount of consumer loss [109] and held Michael Sullivan, deemed "the moving force behind the wrongful acts and practices of the corporation," [110] jointly and severally liable with the corporate defendant.[111]

The *Auto Club* court's holding with respect to Angela Sullivan is completely inapposite to ACL's situation because it goes to the issue of individual liability for corporate practices.[112] Moreover, if anything, the *Auto Club* opinion is inconsistent with the defendants' argument regarding consumer redress. When addressing the corporate defendant's liability, it stated that "[t]he proper amount of relief is the full amount lost by consumers." [113] Accordingly, ACL cannot avoid the asset freeze on the grounds that it did not receive the full amounts billed by AT & T.

### IV.

Defendants motion for judgment on the pleadings is denied. Plaintiff's motion to modify the preliminary injunction to extend it to ACL is granted.

SO ORDERED.

---

108. *Id.*

109. *See id.* at 534–35.

110. *Id.* at 536.

111. *See id.* at 537.

112. *See id.* at 535 (setting out the standard for individual liability before addressing the issue of Mrs. Sullivan's liability); *see also FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir.), *cert. denied*, 493 U.S. 954, 110 S.Ct. 366, 107

L.Ed.2d 352 (1989) ("Once corporate liability is established, the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them.").

113. *Five–Star Auto Club*, 97 F.Supp.2d at 534 (citing *FTC v. Febre*, 128 F.3d 530, 535–36 (7th Cir.1997), *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir.1996), and *FTC v. U.S. Sales Corp.*, 785 F.Supp. 737, 753 (N.D.Ill.1992), *modified by* No. 91 C 3893, 1992 WL 104819 (N.D.Ill. May 6, 1992)).