**FEDERAL TRADE COMMISSION, Plaintiff,**

v.

**VERITY INTERNATIONAL, LTD., et al., Defendants.**

**No. 00 Civ.7422(LAK).**

United States District Court, S.D. New York.

Sept. 17, 2004.

Lawrence Hodapp, David M. Torok, Federal Trade Commission, Washington, DC, for Plaintiff.

John J.D. McFerrin–Clancy, Jeffrey M. Eilender, Schlam Stone & Dolan, New York City, for Defendants Automatic Communications Limited, Verity International, Ltd., Robert Green and Marilyn Shein.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Pornography and other adult material is one of the biggest businesses on the Internet. Operators of websites offering such content nevertheless struggle with the fact

that collecting for access to their wares can be problematic, especially with customers who are reluctant to send their credit card information off into cyberspace or who do not wish charges for such material to appear on credit card or other bills.

The remaining defendants in this case— Robert Green, Marilyn Shein, Automatic Communications Ltd. ("ACL"), and Verity International, Ltd. ("Verity") (collectively, the "defendants" or "ACL defendants")— hit upon a solution.[1] They offered adult content website operators a service whereby defendants arranged to have customers billed for access by including the charges on the telephone bills for the telephone lines over which the customers accessed the Internet and describing the charges as being for telephone calls to Madagascar. When some customers balked at paying often large amounts for alleged telephone calls to Madagascar, defendants and those with whom they contracted insisted that the customers were responsible for any charges incurred on their telephones and demanded payment. But there were at least two fundamental problems.

First, the individuals who subscribed to the telephone lines to which the charges were billed often neither accessed, nor authorized anyone else to access, the adult content websites. Their telephone lines were used by others. But defendants insisted on payment notwithstanding.

Second, the telephone calls were not connected to Madagascar. Defendants arranged to have the calls "short-stopped" in London, where they were connected to the websites of their clients.

The Federal Trade Commission ("FTC") brought this action, claiming in essence that defendants violated Section 5(a) of the Federal Trade Commission Act (the "FTC Act")[2] by (1) representing that line subscribers were liable for, and demanding payment of, charges incurred on their telephone lines irrespective of whether the line subscribers themselves accessed, or authorized others to access, the websites, and (2) issuing bills that misrepresented the services provided by describing them as telephone calls to Madagascar when in fact they were for a package including access to Internet content and telephone calls to London. The FTC seeks principally a permanent injunction prohibiting Verity, Green and Shein from engaging in any capacity in the provision of audiotext or videotext services to U.S. consumers and prohibiting ACL from billing subscribers without express authorization. The case has been the subject of several previous opinions and orders, familiarity with which is assumed.[3]

1. The amended complaint named also as defendants Integretel, Inc. ("Integretel") and its subsidiary, eBillit, Inc. ("eBillit") (collectively, the "Integretel defendants"), which entered into a consent decree. See FTC v. Verity Int'l, Ltd., No. 00 Civ. 7422(LAK) (S.D.N.Y. Nov. 21, 2002). A third-party complaint against AT & T also has been resolved.

2. 15 U.S.C. § 45(a) (2004).

3. See FTC v. Verity Int'l, Ltd., No. 00 Civ. 7422(LAK), 2002 WL 1905983 (S.D.N.Y. Aug. 16, 2002) (denying without prejudice FTC's motion for summary judgment); FTC v. Verity Int'l. Ltd., No. 00 Civ. 7422(LAK), 2002 WL 1446627 (S.D.N.Y. July 3, 2002) (denying defendants' summary judgment motions); FTC v. Verity Int'l, Ltd., 194 F.Supp.2d 270 (S.D.N.Y.2002) ("Verity III") (extending preliminary injunction to defendant ACL); FTC v. Verity Int'l. Ltd., No. 00 Civ. 7422(LAK), 2001 WL 504849 (S.D.N.Y. May 14, 2001) (modifying preliminary injunction); FTC v. Verity Int'l, Ltd., 140 F.Supp.2d 313 (S.D.N.Y. 2001) ("Verity II") (holding Green and Shein in civil contempt for failure to comply fully with preliminary injunction); FTC v. Verity Int'l, Ltd., 124 F.Supp.2d 193 (S.D.N.Y.2000) ("Verity I") (granting FTC's motion for preliminary injunction); FTC v. Verity Int'l, Ltd., No. 00 Civ. 7422(LAK), 2000 WL 1805688 (S.D.N.Y. Dec. 8, 2000) (continuing temporary restraining order).

The parties agreed to a bench trial on a stipulated record consisting of declarations, exhibits, and other evidence.[4] This opinion contains the Court's findings of fact and conclusions of law.

I

## A. The Parties

ACL and Verity are Bahamian corporations[5] that operated billing services for Internet pornographers.[6] The billing systems provided website operators with an alternative to collecting credit card information from users by engaging ACL or Verity, which in turn charged the person whose telephone line was used to connect to the Internet for access to the operator's site.[7]

Green and Shein were founders, principals, and major shareholders of both companies.[8] Each held 50 percent of Verity.[9] Each held 40 percent of ACL until September 20, 2000, when Oriel Communications Ltd. ("Oriel"), a publicly traded Australian corporation, acquired a 50 percent interest in the company.[10] As a result of the Oriel acquisition, Green and Shein each owned 20 percent of ACL shares and roughly 11 percent of Oriel shares.[11]

Green and Shein concede that they jointly controlled the acts and practices of ACL and Verity from the date the companies were incorporated up until September 18, 2000 and October 2, 2000, respectively.[12] Most of the companies' activities were based upon industry contacts that these two individuals developed over a ten-year period.[13]

ACL continued operations after the Oriel acquisition in September 2000 and became the key focus of Oriel's business operations.[14] Verity's operations, by contrast, were short-lived. It apparently began operations just prior to the Court's issuance of a temporary restraining order in October 2000 and ceased all operations soon afterward.[15]

## B. Basic Operation of the Billing System

The billing system at the center of this litigation operated in the following way. A computer user who was logged onto the Internet through an Internet service provider ("ISP") would visit a website providing adult content.[16] The website would offer the user an opportunity to purchase additional web content using a dialer program.[17]

---

4. *FTC v. Verity Int'l, Ltd.*, No. 00 Civ. 7422(LAK) (S.D.N.Y. Aug. 15, 2002).

5. Pre-trial Order ("PTO") § III ¶ 2 (All subsequent references to the PTO, unless otherwise indicated, are to Section III, which contains stipulations of facts).

6. PX 133 ¶¶ 2–3, 28 (Blanchard Decl.); PX 161 at 4–5 (Oriel, 2000 Annual Report); ACL Defs. SJ Mem. 26.

7. PX 133 ¶ 27.

8. PTO ¶¶ 5–6, 17–18, 21; PX 156 at 5 (Blanchard Decl.).

9. PX 156 at 5.

10. PTO ¶¶ 6, 8, 18.

11. *Id.* ¶¶ 5, 15, 17, 20.

12. *Id.* ¶¶ 22–23.

13. *See* PX 154 ¶¶ 2, 19 (Green Decl.); PX 155 ¶¶ 2, 14 (Shein Decl.).

14. PX 161 at 4.

15. PX 156 ¶ 3.

16. PX 133 ¶ 28. Although defendants indicate that their billing system could have been used to provide any type of web content, not just pornography, they do not dispute that the websites in question exclusively carried adult content. *See* ACL Defs. SJ Mem. 26; *see also* Chacon Dep. 15 (Shein told eBillit representative that websites provided adult entertainment); Calgano Dep. 51 (Shein made same representation to Integretel representative).

17. PX 133 ¶ 28. The website might offer also the alternative of paying by credit card. *Id.*

If the user selected the dialer option, the website presented the user with a disclosure containing the terms and conditions of use.[18] The disclosure identified the per minute rate for access and explained that charges would appear on the line subscriber's phone bill as an international telephone charge.[19] If the user affirmatively agreed to these terms and conditions by clicking a box that read, in substance, "I agree" or "I accept," [20] a dialer program was downloaded onto the user's computer.[21] The user then initiated the dialer by clicking another icon.[22] The dialer thereupon disconnected the user's modem from the ISP and placed a long-distance telephone call to a Madagascar telephone number.[23]

The calls did not in fact go through to Madagascar. They were connected instead to Internet servers in the United Kingdom (i.e., the calls were "short-stopped").[24] The website operator then sent web content over the phone lines to the caller.[25] The dialer program caused the cost of accessing these services to be billed to the subscriber whose line was used to place the Madagascar phone call, regardless of whether the subscriber was the person who used the services.[26] The subscriber whose line was used to access the services was identified through an automatic number identification ("ANI") system, which is the system used by carriers such as AT & T to bill for ordinary phone calls.[27]

 Initially, the charges appeared on the subscribers' telephone bills as charges for long-distance calls to Madagascar.[28] Later, defendants sent subscribers separate bills for the services, but continued to represent that the calls terminated in Madagascar.[29]

18. PTO ¶ 28.

19. PX 151B at 10–20 (Green Decl.); see also PX 133 ¶ 28.

20. PTO ¶ 28.

21. PX 133 ¶ 28.

22. Id.

23. Id.

24. Interr. No. 4; PX 133 ¶ 28.

25. See PX 133 ¶ 28.

26. See PX 151B ¶ 9; PX 133 ¶ 28; P.I. Hrg. Tr. 95–96.

27. PX 133 ¶ 28; PX 151B ¶ 28; P.I. Hrg. Tr. 95–96.

28. See PX 133 ¶ 15; PX 83 at 4 (AT & T bill); PX 86 at 7 (same); PX 89 at 4 (same); PX 91 at 5 (same). The cited bills are attached to consumer declarations that defendants objected to on hearsay grounds. See infra note 78. Even if the statements in the declarations are inadmissible hearsay, the bills have sufficient distinctive characteristics to be authenticated under Federal Rule of Evidence 901(b)(4), which provides that authentication may be established by "appearance, contents ... and other distinctive characteristics, taken in conjunction with the circumstances." Here, the bills were collected from customers and contain the typical features of a telephone bill, such as the billing company's logo, a list of the calls being billed, and the consumer's account information. These features and circumstances are sufficient to establish the authenticity of the bills. Moreover, the bills are not subject to a hearsay objection because they are not offered to prove the truth of the matters asserted, but instead to prove that the statements contained in the bills were made. In any case, the Court infers, and therefore finds, on the basis of stipulations and admissions, that (1) AT & T billed the Internet services provided by defendants' clients as telephone calls to Madagascar, and (2) AT & T told consumers that they were legally obligated to pay for such services, irrespective of whether they made or authorized the calls. See, e.g., PTO ¶¶ 38–45; Adm. Nos. 44–51.

29. PX 133 ¶ 15; PX 1 at 3 (Verity bill); PX 6 at 2 (same).

### C. ACL Devises and Implements the Billing System

A principal point of contention between the parties is the extent of defendants' role in the billing system described above. The defendants attempt to minimize their role by assigning blame to the carriers, billing and collection agencies, information providers ("IPs") or website operators.[30] But the Court finds that the ACL defendants devised, implemented, and controlled the system by entering into a series of agreements with carriers, IPs, and billing and collection agents.[31]

#### 1. The Telecom Malagasy Agreement

The ACL billing system began to take shape in May 1997, when ACL obtained exclusive rights from Telecom Malagasy ("TM"), the official telecommunications carrier for Madagascar, to carry calls to a range of telephone numbers that had been assigned to Madagascar for international telephone connections.[32] The agreement authorized ACL to arrange for the carriage of traffic to those numbers, to terminate the calls at any location of ACL's choosing (including locations outside Madagascar), and to receive revenues for those calls.[33]

#### 2. The IP Agreements

The next pieces to ACL's billing system were its agreements with IPs. ACL contracted with Global Internet Billing, Inc. ("GIB"), and possibly other IPs, to market dialer billing programs that contained the phone numbers assigned to ACL.[34] Under an agreement with ACL dated February 23, 2000, GIB agreed to market the information services associated with the telephone numbers and to use its best efforts to generate an agreed upon volume of usage to those numbers.[35] ACL in turn agreed to pay GIB a fee based upon the usage minutes.[36] A subsequent amendment, dated March 31, 2000, provided that ACL must authorize services that used the numbers for modem dialing and granted ACL some authority to approve disclaimers.[37] ACL did not itself create or provide web content.[38]

---

30. E.g., PTO Ex. A at 3–11.

31. Despite defendants' representations that ACL played a minimal role in the billing system, representatives of ACL and Verity described the companies as providers of dialer billing systems. E.g., PX 133 ¶ 28 (Blanchard Decl.) (describing how the "dialer service provided ACL" operates); PX 151B ¶ 2 (Green Decl.) ("Verity operates a billing mechanism which affords consumers seeking access to various websites the convenience and privacy of allowing the access fee to be charged to the consumer's telephone bill, rather than the consumer's credit card."); PX 161 at 4 (Oriel, 2000 Annual Report) (ACL specializes in providing "[d]ialer billing systems [that] enable consumers to be charged for access to websites to the telephone line being used by their computer modem.")

32. See PTO ¶ 24; PX 157A; PX 133 ¶ 5.

33. PX 157A Ex. 1.

34. PTO ¶¶ 31–32.

35. PX 157A Ex. 2; PX 150 at 13. Although the agreement identifies the contracting parties as GIB and Western Connections (as opposed to ACL), defendants have represented that the agreement was between GIB and ACL. E.g., ACL Defs. SJ Mem. 5 ("ACL entered into an agreement with GIB, whereby ACL would provide GIB with the Madagascar number ranges to insert into the dialer program ..."); PX 157A ¶ 7 (Blanchard Decl.) (attaching "true and complete" copy of "ACL's agreement with GIB"). According to defendants, Western Connections was an affiliate of ACL. See ACL Defs. 56.1 ¶ 35.

36. PX 157A Ex. 2.

37. PX 150 at 13.

38. PTO ¶¶ 29–30.

### 3. The Carrier Agreements

### (a) The AT & T Agreement

The other components to ACL's billing system were its agreements with originating carriers—first AT & T and then Sprint—to carry, bill for, and collect on the calls.[39] In January 1999, ACL entered into an agreement with AT & T and AT & T U.K. (later known as Viatel) for the carriage and termination of traffic to the Madagascar telephone numbers assigned to ACL.[40] AT & T agreed to send the calls to AT & T U.K.'s London facilities, which would accept the calls on a transit basis and forward them to ACL for termination in Madagascar.[41]

The agreement further provided that payments be made in a "cascade arrangement." [42] AT & T would pay to AT & T U.K. the amounts due to both AT & T U.K. and ACL, and AT & T U.K. in turn would pay ACL.[43] AT & T would set prices for the calls.[44] ACL, Green, and Shein knew that AT & T, either directly or through local exchange carriers ("LECs"), would disseminate, attempt to collect on, and handle consumer complaints regarding bills for calls to the Madagascar numbers assigned to ACL.[45]

### (b) The Sprint Agreement

In July 2000, after discovering that ACL's lines were being used to carry videotext,[46] AT & T promptly terminated the contract and ceased carrying calls.[47] ACL quickly entered into an agreement with Sprint, on July 11, 2000, for Sprint to carry, bill for, and collect on the calls.[48] The agreement provided that Sprint would carry the calls to ACL, which would carry, or utilize others to carry, the calls for termination in Madagascar.[49] Sprint would pay a portion of the monies it collected to ACL.[50]

The Sprint agreement recognized that calls would be made using a dialer program that provided access to entertainment services. ACL there represented that it "owns internet/based [sic] dialer software that it licenses to third parties for entertainment services." [51] The agreement required ACL to incorporate into the dialer software at least two specifically-worded disclaimers, both of which would be displayed to the consumer before the Madagascar number was dialed.[52] The disclaimers stated, in substance, that the dialer would place a long-distance call to Madagascar that would be billed to the user's phone bill.[53]

**39.** In order to bypass the line subscriber's designated carrier, the dialer placed the call using a dial-around sequence in the format 10–10–CIC, where CIC represented the unique identification code of the carrier chosen by ACL. Fox Dep. 32–33; McHale Dep. 41–42.

**40.** PTO ¶ 34; PX 151A.

**41.** PX 151A at 2.

**42.** PTO ¶ 45; PX 151A at 6–7.

**43.** PX 151A at 6–7.

**44.** Id. at 3.

**45.** PTO ¶¶ 39, 42.

**46.** For purposes of this opinion, videotext refers to information services provided via the

Internet. See FTC SJ Mem. 4; ACL Defs. SJ Mem. 5. Calls carrying videotext are the only type of calls at issue in this litigation.

**47.** Verity III, 194 F.Supp.2d at 284; see also PTO ¶¶ 35–38; PX 128 ¶ 3.

**48.** PX 203.

**49.** Id. at 1.

**50.** Id. at 3.

**51.** Id. at 8.

**52.** Id.

**53.** The first disclaimer stated:

"By clicking on this icon, you will be disconnected from your internet provider and will

Although Sprint originally agreed to bill and collect for charges, it never did so. The parties entered a settlement agreement on August 16, 2000 that called for an end to the July 11 agreement on or before September 18, 2000.[54] The settlement agreement released Sprint from its billing and collection responsibilities, but permitted ACL to perform these activities so as long as ACL followed certain protocols.[55] For example, ACL agreed to charge users no more than $3.99 per minute and to use customer-friendly collection practices.[56] In addition, the agreement required ACL to pay Sprint a per minute transport fee.[57] Sprint agreed to provide ACL with the ANI information needed to identify the subscribers whose lines had been used to call the Madagascar phone numbers.[58]

The settlement agreement stated that Sprint was induced to sign only upon

ACL's warranting that the calls were actually being terminated inside Madagascar.[59]

### 4. The eBillit Agreement

After Sprint declined to bill for the ACL traffic, ACL made other arrangements to bill for the calls. On August 21, 2000, Verity entered into an agreement with eBillit whereby eBillit would prepare and mail bills, collect payments, and handle consumer inquiries.[60] Integretel and eBillit in turn subcontracted Output Services Group ("OSG") to perform printing and mailing, and ICT Group ("ICT") to provide customer service.[61]

### 5. Cascade Payment Arrangement

The result of all these agreements was a cascade payment arrangement whereby money flowed from consumers and ultimately to defendants and their client web-

---

be connected to another service provider via an international call. Most services cost $3.99 per minute, which charge will appear on your telephone bill. (Some services will cost more, as described more fully in the next screen should you continue)."
The second disclaimer stated:
"WARNING: BY CLICKING ON THE 'I ACCEPT' BUTTON, YOU WILL DOWNLOAD SOFTWARE THAT WILL CAUSE YOUR COMPUTER MODEM TO DIAL AN INTERNATIONAL LONG–DISTANCE TELEPHONE CALL TO MADAGASCAR, AFRICA. NO CREDIT CARD WILL BE REQUIRED TO ACCESS THIS SERVICE. MOST CUSTOMERS WILL BE CHARGED $3.99 A MINUTE ON THEIR PHONE BILL FOR AN INTERNATIONAL CALL. SOME CUSTOMERS, DUE TO THEIR CALLING PLAN, WILL BE CHARGED UP TO $8.00 PER MINUTE. IF YOU HAVE ANY QUESTIONS AS TO THE EXACT RATE THAT APPLIES TO YOUR CALL, PLEASE CALL 1–800 ____. BILLING WILL BEGIN UPON CONNECTION IN THE FOREIGN COUNTRY. THE INTERNATIONAL NUMBER CALLED IS 261–7–0000 TO 9999...."
*Id.* at 8.

54. PX 204 at 1, 7.

55. *Id.* at 2.

56. *Id.*

57. *Id.* at 8.

58. *Id.* at 2.

59. *Id.* at 1.

60. PX 184. Green and Sheen negotiated the agreement on behalf of ACL, but Green arranged for the agreement to be in Verity's name, not ACL's, on the day the agreement was signed. *See* PX 191 (email from Green to Calgano on August 21, 2000) ("Our accountants have advised us to put the billing into one of our subsidiary companies. Would this present any problems to you? If not would you produce the contract in the name of 'Verity International Ltd' (VIL) and we can sign it today."); Calgano Dep. 131–35. Tellingly, the agreement named ACL (not Verity) as the recipient of net proceeds collected under the agreement. *See* PX 184 at 5, 18. Integretel also replaced its name with that of its subsidiary, eBillit, in the final agreement, even though negotiations were conducted on the parent's behalf. Calgano Dep. 131–32.

61. *See* PTO ¶¶ 52–53.

site operators. Consumers would pay AT & T, which would pay AT & T U.K. (later Viatel), which in turn would pay ACL. ACL then would pay GIB, which in turn would pay website operators.[62] This was the intended structure also of the Sprint arrangement.

Green[63] and Shein[64] were instrumental in setting up all these relationships, which were at the center of the ACL billing system.

## D. The Operation of the System

### 1. The AT & T Period

Between January 1999 and July 23, 2000, AT & T, either directly or through its LECs, carried, billed for, and collected on calls placed to ACL's numbers.[65] Not all of the calls during this period were for videotext. IPs did not begin using ACL's phone numbers to provide videotext until approximately January 2000 and continued to do so through July 23, 2000 (the "AT & T Period").[66]

For billing and collection, AT & T treated the ACL traffic no differently than it treated other residential phone calls.[67] For example, the charges appeared on subscribers' monthly telephone statements as charges for long-distance telephone calls, with Madagascar identified as the "place called."[68] The bills stated that failure to pay might result in disconnection of services and further collection activity.[69]

In addition, AT & T charged subscribers the same rate that it charged under its applicable tariff for genuine phone calls to Madagascar.[70] It billed on the basis of

---

62. ACL Ex. 31.

63. *See, e.g.,* PX 154 ¶ 19 (Green Decl.) ("Most of ACL's activities for the period before and after [the first seven months of 2000] consisted of various telecommunications and billing transactions based on contacts that Marilyn [Shein] and I have developed over the years in the industry, and in particular, our access to exchange numbers in certain parts of the world, including Madagascar."); PX 151A at 14 (Green signed AT & T agreement on behalf of ACL); Dooley Dep. 17–20 (Green helped negotiate agreement with Sprint); PX 203 at 7 (Green signed Sprint agreement on behalf of ACL); Fox Dep. 80–81 (Green met with GIB representative to discuss ways of stimulating traffic); PX 201 (Green initiated contact with Integretel); PX 230 (Green helped negotiate agreement with Integretel); PX 184 at 16 (Green signed eBillit agreement on behalf of Verity).

64. *See, e.g.,* PX 155 ¶ 14 (Shein Decl.) ("Most of ACL's activities for the period before and after [the first seven months of 2000] consisted of various telecommunications and billing transactions based on contacts that Robert [Green] and I have developed over the years in the industry, and in particular, our access to exchange numbers in certain parts of the world, including Madagascar."); Dooley Dep. 17–20 (Shein helped negotiate agreement with Sprint); Calgano Dep. 18, 23–29, 35–37 (Shein helped negotiate agreement with In-

tegretel); *Id.* at 191 (Shein discussed with Integretel outsourcing of calls).

65. PTO ¶ 38; P.I. Hrg. Tr. 49–50.

66. The parties dispute whether IPs began using ACL's numbers to provide videotext in January, February or March 2000. *Compare* FTC 56.1 ¶ 31 *with* ACL Defs. Opp. to FTC 56.1 ¶ 31. The number of minutes AT & T billed remained steady during the last six months of 1999 but then doubled in January 2000, and again in February 2000 (*see* PX 128 Ex. A) (Bolin Decl.), indicating that videotext service probably began in January 2000. *Cf.* PX 161 at 4 (attributing ACL's surge in billings for the 12–month period ending June 2000 to the successful commercialization of its dialer billing system).

67. McHale Dep. 67–69.

68. *See* PX 83 at 4; PX 86 at 7; PX 89 at 4; PX 91 at 5.

69. *See* PX 83 at 4 ("[N]onpayment of toll charges may result in disconnection of local service, and other services may be restricted if not paid.... Unpaid accounts also may be subject to collection action."); PX 86 at 7 (same); PX 89 at 4 (same); PX 91 at 5 (same).

70. PTO ¶ 41.

ANI information,[71] thereby billing the calls to subscribers from whose lines the calls were placed, regardless of whether they made or authorized the calls.[72] Further, it used the same personnel and the same processes to handle ACL calls as it used for all other residential calls.[73] The ACL defendants had no input into ACL's billing and collection process.[74]

After IPs began using the ACL billing system to carry videotext, AT & T experienced a surge in the volume of calls to Madagascar. AT & T billed $28,975,336 for the calls in 2000, compared to $1,643,111 in 1999.[75] AT & T's adjustments for contested bills also increased dramatically, from 8 percent (or $130,005) of total billings in 1999 to 38 percent (or $11,138,773) of total billings in 2000.[76]

ACL received $2,088,031 in 1999 and $8,620,902 in 2000.[77]

■ The parties agree that at least some of the subscribers who received bills were users of ACL's dialer program, but none of the parties knows how many.[78] Nor do the parties know how much of the amount billed was for videotext services. Defendants argue that the amount that AT & T billed in 2000 may be divided equally between videotext and other calls.[79] This estimate of videotext, however, is excessively low. According to Oriel's public filings at the time, the "bulk" of ACL's service charges were for videotext.[80]

### 2. The Sprint Period

Sprint carried calls to the Madagascar numbers assigned to ACL from July 11, 2000 through September 2000 (the "Sprint Period").[81] The Integretel defendants

71. *Id.* ¶ 43.

72. *See* P.I. Hrg. Tr. 95–96.

73. McHale Dep. 67–70.

74. *Id.*

75. PX 128 Ex. A.

76. *Id.*

77. PX 157 at 7 (Sinclair Decl.).

78. PTO ¶¶ 59–60. The FTC offered eleven declarations from consumers who received bills during the AT & T Period, primarily to show that at least some line subscribers were charged for calls to Madagascar that they neither made nor authorized. *See* PX 82 through PX 92. Defendants objected to these declarations on hearsay grounds, and the FTC contends that the declarations are admissible under the residual exception to the hearsay rules, Fed. Rule of Evid. 807. But the issue ultimately is immaterial. Without consideration of the declarations, the Court finds for the FTC.
The FTC offered 81 additional consumer declarations relating to the Sprint Period. *See* PX 1 through PX 81. Defendants waived a hearsay objection to 22 of these declarations, *see FTC v. Verity Int'l Ltd.*, No. 00 Civ.

7422(LAK) (S.D.N.Y. Aug. 5, 2002) (order signing stipulation for presentation of trial evidence), but objected to them on relevancy grounds. These declarations, however, are of obvious relevance to, *inter alia,* the FTC's claim that defendants billed line subscribers for calls that they neither made nor authorized. *See* PX 1; PX 3; PX 6; PX 7; PX 8; PX 9; PX 11; PX 12; PX 14; PX 15; PX 17; PX 18; PX 20; PX 30; PX 31; PX 39; PX 40; PX 41; PX 42; PX 46; PX 53; PX 71 (hereinafter, "Admitted Consumer Decls."). As the 59 consumer declarations to which defendants objected on hearsay grounds are redundant and cumulative, the Court does not consider them in reaching its decision.

79. *See* PX 157 at 5.

80. PX 161 at 5 (Oriel Annual Report for year ending June 2000); *see also id.* at 4 (attributing ACL's rapid business growth in 2000 "primarily to ACL's successful commercialization of dialer billing systems for website access.")

81. *See* PX 203; PX 133 ¶ 28; PX 204; Dooley Dep. 63–64. Sprint may have carried residual traffic for several weeks after September 25, 2000, when it terminated the agreement. *See* Dooley Dep. 63–64. Also, AT & T and Sprint may have carried traffic during the overlapping period between July 11, 2000 and July 23, 2000.

handled billing and collection for this traffic.[82]

The bills sent to consumers during the Sprint Period were mailed separately from the consumers' regular telephone bills.[83] The first page included a summary of the charges, at the bottom of which appeared the "Total Amount Due."[84] The top right corner of the bill identified the invoice number, the account number, the due date, and the total due.[85] Consumers were instructed to make checks payable to Verity.[86] Under the heading "INTERNET BILLING," the bill stated that "THIS BILL ACCOUNTS FOR INTERNATIONAL CALLS, FROM YOUR MODEM TO A MADAGASCAR NUMBER, FOR WEBSITE ACCESS."[87] On the bottom right corner of the bill appeared a 1–800 number for consumers to call with questions about their invoices.[88] The second page of the bill provided a list of details about each call, including date, time, destination (Madagascar), the telephone number called, the duration, and the charges per call. Green approved the final format of the bill.[89]

eBillit and its vendor sent 91,683 bills for July and August services totaling $11,664,986 in the period September 14–20, 2000.[90] They sent no other bills.[91] As did AT & T, the Integretel defendants billed the ACL traffic on the basis of ANI information, which Sprint provided pursuant to its agreement with ACL.[92] Subscribers thus were billed regardless of whether they made or authorized the calls.

The Verity bills prompted thousands of consumer complaints. At least 24,986 consumers contacted eBillit or its vendor about the Verity bills.[93] The FTC received 548 complaints about Verity during the period September 18 through September 22, 2000.[94]

Consumers who attempted to contact eBillit or its vendor to dispute the charges, particularly those who did so prior to the FTC's filing of this action, had little success in obtaining adjustments.[95] Most consumers who tried were unable to get in touch with the call center. Calls to the 1–800 number were routed to ICT's call center in Lakeland, Florida,[96] which was ill-equipped to handle the large volume of

---

**82.** *See* PTO ¶¶ 49, 52–53.

**83.** *See* Admitted Consumer Decls., *supra* note 78.

**84.** *Id.*

**85.** *Id.*

**86.** *Id.*

**87.** *Id.*

**88.** *Id.*

**89.** Calgano Dep. 128–29.

**90.** PTO ¶ 54; PX 133 ¶ 17. Calls were billed at $3.99 per minute, the same rate that Sprint charged under its applicable tariff for genuine calls to Madagascar. PTO ¶ 47; PX 133 ¶ 28; Admitted Consumer Decls., *supra* note 78.

**91.** Calgano Dep. 88, 100.

**92.** PTO ¶¶ 49–50.

**93.** PX 334 (Calgano Decl.). Although the record does not indicate what percentage of these consumers contacted eBillit in order to dispute the charges, the evidence suggests a substantial number. Defendants eventually gave adjustments to 8,651 (35 percent) of the subscribers who contacted them. *See id.* According to eBillit's records, the vast majority of these adjustments (89 percent) were given to consumers who denied making or authorizing the calls to Madagascar. *See id.* Moreover, the number of consumers who contacted eBillit to dispute the charges was likely much higher, as some consumers who tried calling reached a busy signal, despite multiple attempts. *See infra* note 111.

**94.** *Verity I,* 124 F.Supp.2d at 197.

**95.** *See* PX 285; Chacon Dep. 97–103; PX 334.

**96.** Calgano Dep. 22.

calls.[97] As a result, some callers reached a busy signal and were unable to get through, despite numerous attempts.[98] During the week of September 18 (the first full week in which the call center handled inquiries about Verity bills), callers who did not get a busy signal waited an average of over 19 minutes to speak with a representative, and 72 percent of the calls made to the 1–800 number were abandoned.[99] Some callers waited more than an hour.[100]

Those callers who succeeded in speaking with customer service representatives ("CSRs") faced yet another hurdle. At Verity's direction, the call center implemented a "hard sustain" approach to handling consumer calls.[101] Callers who waited to speak with a CSR were played a recording that warned that "[f]ailure to pay a Verity International bill may result in the blocking of your phone line to services of this nature from a variety of content providers and further collection activity of past due amounts."[102] In addition, CSRs were instructed to withhold adjustments until after a two-minute "sustain period," to limit adjustments to a one-time courtesy of no more than 50 percent, and to advise callers that the charges were valid and must be paid and that nonpayment would subject the subscriber to further collection activity.[103] The call center monitored CSRs to ensure their compliance with these rules.[104] Green and Shein worked with the call center to implement this approach.[105]

Not until after the FTC brought this action did the ICT call center soften its approach to handling consumer complaints. CSRs were permitted to grant one-time 100 percent courtesy adjustments, and were required to do so after a 2–minute sustain period.[106] In addition, CSRs were prohibited from telling consumers that nonpayment would result in further collection activity.[107] But even after ICT changed its policy for handling consumer complaints, some CSRs continued to grant only 50 percent adjustments, even for subscribers who denied making or authorizing the calls.[108] Nevertheless, the FTC's action did prompt an increase in adjustments. Prior to the FTC's action,

97. Chacon Dep. 90–91, 97–103; PX 285.

98. *See, e.g.,* PX 1; PX 3; PX 6; PX 7; PX 8; PX 9; PX 11; PX 14; PX 15; PX 16; PX 17; PX 18.

99. Chacon Dep. 97–103; PX 285. In September 2000, 21,187 of the 35,421 calls made to the call center (60 percent) were abandoned, and callers who did not abandon their calls waited an average of over twelve minutes to speak with a customer service representative. Chacon Dep. 97–103; PX 285. In October 2000, 8,408 of the 20,239 calls made to the call center (42 percent) were abandoned, and callers who did not abandon their calls waited an average of over two minutes to speak with a customer service representative. Chacon Dep. 97–103; PX 285. It is unclear whether these statistics, provided by defendants, include calls that were answered by a busy signal.

100. PX 285.

101. Chacon Dep. 66–67.

102. PX 282; Chacon Dep. 90–92.

103. PX 275; PX 276; Chacon Dep. 32–36, 72–77.

104. Chacon Dep. 55–58.

105. PX 275 (email from Green approving instructions given to CSRs); Chacon Dep. 27–35 (Green approved instructions given to CSRs); *id.* at 72–77 (Shein reiterated to call center that it follow hard sustain approach); *id.* at 90–92 (Shein approved phone recording).

106. PX 286; Chacon Dep. 108–09.

107. PX 286; PX 287; Chacon Dep. 108–09.

108. Chacon Dep. 113.

only 3 percent of the 11,799 consumers who disputed the charges received adjustments, compared with 63 percent of the 13,187 consumers who did so after the FTC's action.[109]

Most of the consumer declarations in evidence contain the personal accounts of line subscribers who received bills for calls that they neither made nor authorized.[110] Many of these consumers tried to call Verity numerous times but received busy signals.[111] Those who eventually succeeded in connecting to a CSR first were put on hold for significant times, only to be told that the bills must be paid.[112] Some consumers tried to find an alternative phone number for Verity by calling directory assistance in San Jose, California.[113] These callers were put through to a different company, similarly named Verity, which (perhaps in response to a substantial number of calls) played a recorded message explaining that it was unaffiliated with Verity International and providing callers with contact information for the FTC.[114]

By the end of this billing disaster, 19,544 consumers who had received a Verity bill paid $1,616,678 in response to bills that were mailed on Verity's behalf.[115] As is true of the AT & T Period, neither the FTC nor any of the defendants knows the number of subscribers that made or authorized the calls for which they were billed.[116] Of the 19,544 customers that made payments, 6,248 made an inquiry, and some received an adjustment of less than the full amount.[117] These 6,248 persons paid $573,811 of the $1.6 million collected in response to the Verity bills.[118]

## II

The FTC asserts four claims for relief, all under Section 5(a) of the FTC Act.[119] Count I alleges that defendants engaged in a deceptive practice by misrepresenting, or causing others to misrepresent, that line subscribers were legally obligated to pay for videotext services, irrespective of whether they used or authorized use of those services. Count II alleges that these misrepresentations constituted an unfair practice. Count III contends that defendants engaged in a deceptive practice by causing bills to show that calls terminated in Madagascar, when in fact the calls were short-stopped elsewhere. Count IV asserts that defendants deceptively failed to disclose, or failed to ensure that others disclosed, in a clear and conspicuous manner the cost of connecting to videotext services through the ACL billing system.

### A. FTC Jurisdiction

Defendants argue that ACL is a common carrier and therefore outside the FTC's jurisdiction.[120] This Court previ-

---

109. PX 334.

110. *See, e.g.,* PX 6; PX 8; PX 9; PX 11; PX 14; PX 15; PX 17; PX 18; PX 30; PX 40; PX 41; PX 42; PX 53.

111. *E.g.,* PX 3 (called approximately 30 times a day for five days); PX 6 (called at least 20 times at various hours during one week); PX 11 (called approximately 30 times over several days).

112. PX 1 at 2 (put on hold for 40 minutes); PX 3 at 1 (put on hold for 35 minutes).

113. PX 1; PX 6; PX 7; PX 8; PX 9; PX 11; PX 14; PX 15; PX 20; PX 30.

114. PX 1; PX 6; PX 7; PX 8; PX 9; PX 11; PX 14; PX 15; PX 20; PX 30.

115. PTO ¶ 55.

116. *Id.* ¶ 59.

117. PX 334.

118. *Id.*

119. 15 U.S.C. § 45(a).

120. PTO Ex. A. ¶ 1.

ously addressed this contention and concluded that "the ACL activities at issue in this case are [not] common carrier activities within the meaning of the Communications Act." [121] As the facts considered by the Court in reaching that conclusion have not changed,[122] the prior holding is dispositive.

### B. Deceptive Practices

■ Section 5(a) of the FTC Act declares unlawful any "unfair or deceptive acts or practices in or affecting commerce." [123] To establish that an act or practice is deceptive under Section 5(a), the FTC must demonstrate "a material representation, omission, or practice that is likely to mislead consumers acting reasonably in the circumstances." [124]

### 1. Legal Obligation to Pay (Count I)

To prevail on its first claim for relief, the FTC must establish that (1) the defendants represented, or caused others to represent, to line subscribers that they were legally obligated to pay irrespective of whether they used or authorized use of the Internet services provided by defendants' clients, and (2) the representation was materially false or deceptive.

### (a) The Representations

■ During the AT & T Period, consumers were charged for using the services of defendants' clients through regular monthly telephone bills. These bills stated that nonpayment might result in disconnection of telephone service and further collection activity.

Defendants argue that they are not liable for these representations because defendants did not contribute to the format or content of the AT & T bills. But the fact that AT & T used its standard telephone bills, unaltered by defendants, was a valuable and intended feature of defendants' overall scheme. Defendants knew that AT & T would bill for the services as if they were genuine telephone calls to Madagascar on regular monthly telephone statements. In this way, defendants deliberately capitalized on the common and well-founded perception held by consumers that they must pay their telephone bills, irrespective of whether they made or authorized the calls being charged.

■ Although the charges did not appear on subscribers' regular phone bills during the Sprint Period, the Verity bills featured all the characteristics of, and conveyed the same message as, a regular phone bill. The bills stated that the charges were for international phone calls and provided details about each call, including the date, time, destination (Madagascar), telephone number called, and duration. They included an account number, a total amount due, and a due date, and they instructed consumers to mail their payments to Verity. Recipients reasonably would have understood these bills to represent that the charges in fact were due and owing and that the addressees were obliged to pay or face the consequences that normally ensue from failure to pay a telephone bill.

Moreover, the call center reiterated the message. The recording that was played

---

121. *Verity III*, 194 F.Supp.2d at 277.

122. *See id.* at 274–77.

123. 15 U.S.C. § 45(a).

124. *Verity I*, 124 F.Supp.2d at 200 (citing *FTC v. Pantron 1 Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994), *cert. denied*, 514 U.S. 1083, 115 S.Ct. 1794, 131 L.Ed.2d 722 (1995); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir.1988); *FTC v. Five–Star Auto Club, Inc.*, 97 F.Supp.2d 502, 526 (S.D.N.Y.2000)).

to callers who were put on hold warned that failure to pay might result in blocking of their phone lines to (obscurely) "services of this nature" as well as further collection activity. Also, CSRs told consumers that the charges were valid and must be paid. Even though the call center may have instructed CSRs to modify their approach to handling calls after the FTC filed its lawsuit, there is no indication that any consumers were told that they were not legally obligated to pay if they had not used or authorized use of the services.

Defendants contend that, since eBillit performed billing and collection during the Sprint Period, they are not liable. The Court is not persuaded. Defendants contributed to, approved and supervised the methods that eBillit and its subcontractors used. The format of the bills, the audio voice recording, and the instructions given to CSRs all received defendants' approval.

In all the circumstances, the Court finds that defendants represented that line subscribers were legally obligated to pay these charges irrespective of whether they used or authorized use of the services of defendants' website clients.

### (b) Falsity

The next issue is whether line subscribers who neither used nor authorized use of the services of defendants' clients were legally obligated to pay. If they were not, then defendants' representations were materially false.

■ Defendants argue that line subscribers were legally obligated to pay, irrespective of whether they accessed or authorized access to the services of defendants' clients, under the filed rate doctrine, which holds that telephone subscribers are legally obligated to pay for calls made from their telephone lines regard-

less of whether the subscribers themselves made or authorized the calls.[125] The filed rate doctrine does not apply here. This Court previously has explained the difficulty with defendants' position:

> "The FCC long has distinguished between basic telecommunications carriage—principally ordinary telephone and long distance service—and enhanced services such as those offered by Verity's clients. In *Amendment of Section 64.702 of the Commission's Rules and Regulations,* for example, the FCC declined to institute comprehensive regulation for enhanced services and found that vendors of enhanced services, defined as anything more than basic transmission service, were not engaged in common carrier activity. The Telecommunications Act of 1996 likewise distinguishes between telecommunications services and information services, stating that 'a telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services.' While basic communications services long have been covered by filed tariffs, enhanced and information services have not. Thus, there appear to be no tariffs governing the rates or the terms and conditions upon which these services are offered. At any rate, defendants have pointed to none." [126]

Here, defendants provided more than basic transmission service. They operated a system that effectively collected charges for web content. The system included both content and a package of services that involved, among other things, downloading a dialer program onto users' computers, displaying to the user a disclosure

---

125. *Verity I,* 124 F.Supp.2d at 200–02 (collecting cases).

126. *Id.* at 201–02 (citations omitted).

containing the terms and conditions of use, disconnecting the users' phone line from an ISP, reconnecting the phone line to the Internet, and short-stopping calls at web hosts in the United Kingdom. This was an enhanced, not a basic, telecommunications service.

Nor have defendants identified a filed tariff that covered the services they offered. Defendants contend that the filed rate doctrine applies because the calls were nothing more than telephone service and therefore were covered by the AT & T and Sprint tariffs for long-distance calls to Madagascar.[127] According to defendants, neither they nor anyone else changed the form or content of the calls, and consumers were billed only for the carriage of their calls to the Madagascar numbers. This contention falls short. Consumers were not charged merely for the carriage of calls to Madagascar, but for a package of Internet services that included a dialer billing program, the short-stopping of calls outside of Madagascar, and Internet web content. This package was not covered by either the Sprint or AT & T tariffs that defendants rely upon, as those tariffs are for basic international phone calls.[128]

■ Although the filed rate doctrine did not create a legal obligation to pay for the services, the question remains whether line subscribers were legally obligated to pay based upon the existence of contracts with the defendants. This issue is disposed of easily. As the Court explained previously: "[B]asic contract principles provide that an offer and acceptance create a contract only between the offeror and the offeree. . . . Accordingly, unless the line subscriber is the person who accepts the offer by clicking on the 'I accept' box, there is no con-tract between the defendants or their clients, on the one hand, and the line subscriber, on the other." [129]

■ The Court finds that defendants represented to consumers that they were legally obligated to pay for the Internet services provided by defendants' clients. To the extent that the bills were sent to line subscribers who did not access or authorize access to the services, this representation was materially false and a violation of Section 5(a) of the FTC Act.

### 2. Re-routing calls (Count III)

■ Count III alleges that defendants violated Section 5(a) by billing consumers for calls to Madagascar, when the charges were for calls that terminated in other countries. Defendants concede that the calls were terminated outside Madagascar. Yet during both the AT & T and Sprint Periods, the bills indicated that the calls were to Madagascar. Reasonable consumers were likely to believe exactly what the misrepresentations stated—that the charges were for phone calls to Madagascar. In addition, these misrepresentations were material. The destination of a phone call in part determines its price and is essential to a consumer's understanding of the basis of the charges being billed. To the extent that defendants made this representation to subscribers who did not agree, or authorize others to agree, to the terms and conditions of the disclosure form, defendants made a materially false representation in violation of Section 5(a).

Defendants contend that no misrepresentation occurred because the calls were completed to the numbers dialed and therefore were covered by the filed tariffs.

---

127. *See* PTO Ex. A ¶ 23.

128. *See* PX 331 (AT & T Tariff No. 27); PX 299 (Sprint Tariff No. 1). Moreover, as discussed *infra* p. 498, these tariffs applied to calls that terminated *inside* the foreign country.

129. *Verity I,* 124 F.Supp.2d at 202.

This argument fails. The bills misrepresented that the location called was Madagascar and, based upon this misrepresentation, sought to extract high prices. Moreover, the tariffs that defendants rely upon cover calls that terminate *inside* the foreign destination. Sprint Tariff No. 27 states that "the rates apply to all calls which originate in the contiguous United States . . . and *terminate in the international locations* . . ." [130] Similarly, AT & T Tariff No. 1 states that the rates apply to service "between one or more stations in the Mainland [and other places] and one or more stations . . . *in* a foreign country or area." [131] Defendants misrepresented the terminating country and capitalized on the misrepresentation by invoking a high tariff.

The Court finds that defendants violated Section 5(a) by misrepresenting, or causing others to misrepresent, that calls were terminated in Madagascar, when in fact the calls were terminated elsewhere.

### 3. Disclosure of Costs (Count IV)

 The FTC's fourth claim for relief is that defendants failed to disclose in a clear and conspicuous manner the cost of using the Internet services provided by defendants' clients. This claim is without merit. The costs were identified plainly on a disclosure form, no more than two pages in length, that was displayed to users before they accessed the services.[132]

### C. Unfair Practices (Count II)

 The FTC's second count alleges that defendants' practice of billing line subscribers who did not use or authorize use of the Internet services offered by the defendants' clients constituted an unfair trade practice in violation of Section 5(a) of the FTC Act. An act or practice is unfair if

it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." [133]

The Court infers, and therefore finds, that during the AT & T Period, many line subscribers were charged for services they neither made nor authorized. AT & T and its LECs billed on the basis of ANI information, which identified the subscriber from whose line a call was placed without determining whether that same person made or authorized the call. In addition, AT & T charged back 35 percent of total billings in 2000, when videotext services began, compared to 11 percent of total billing during the prior year. This surge in adjustments indicates that many consumers called to dispute the charges and most likely did so for the same reason as during the Sprint Period-because they neither made nor authorized the calls. In all the circumstances, the Court finds that a significant proportion of the subscribers billed during the AT & T Period neither incurred, nor authorized others to incur, the charges billed to them.

During the Sprint Period, at least 8,651 of the 91,683 consumers who received bills (9 percent) were given adjustments because they denied using or authorizing use of the services. The actual number of subscribers who received bills for calls they did not make or authorize was certainly much higher, as thousands of callers were unable to get through to the call center and many of those who did get through were denied an adjustment, irrespective of whether they had used or authorized use of the services.

---

130. PX 299 at 2 (emphasis added).

131. PX 331 at 1 (emphasis added).

132. *See* PX 112 at 3.

133. 15 U.S.C. § 45(n).

The substantial injury to consumers who did not make or authorize the calls is not outweighed by the possible benefit to consumers of having an alternative to disclosing credit card information over the Internet. The thousands of consumer complaints and the large number of charge backs illustrate widespread dissatisfaction.

Defendants contend that there was no unfair trade practice because line subscribers reasonably might have protected themselves against injury by, for example, controlling access to their phone lines, placing an international-call block, locking their computers, or downloading software that would have prevented access to adult websites.[134] Even assuming that such practices would have been effective, the difficulty with defendants' position is that it would require consumers first to suffer an injury and then to find and implement a solution to avoid being injured again. Meanwhile, defendants profit from this injury, as many consumers who are fearful of incurring damage to their credit ratings pay the bills irrespective of whether they used or authorized use of the services of defendants' clients.

The Court finds that defendants' practice of billing line subscribers for Internet services that they neither used, nor authorized use of, constituted an unfair trade practice in violation of Section 5(a) of the FTC Act.

### D. Individual Liability

■ To establish individual liability for corporate violations of the FTC Act, the FTC must prove that an individual defendant (1) participated directly in the wrongful practices or acts or had authority to control them, and (2) had some knowledge of the wrongful practices or acts.[135] Authority to control may be shown "by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer."[136] The FTC need not prove intent to defraud in order to establish a violation under the Act or to obtain injunctive or monetary relief against an individual.[137]

Green and Shein participated directly in, and had authority to control, the wrongful practices of the corporate defendants. They concede that they jointly controlled the acts and practices of ACL and Verity up until September 18, 2000 and October 2, 2000, respectively.[138] They were founders, principals, and major shareholders of both companies.

In addition, the FTC has proved that Green and Shein knew of ACL's and Verity's practices. They conceived of the ACL billing system and implemented it by contracting with AT & T, Sprint, GIB, Integretel, and eBillit. During both the AT & T and Sprint Periods, they knew that the phone calls were to access Internet services, that the calls were being short-stopped outside of Madagascar, and that the bills would reflect charges for phone calls to Madagascar, instead of charges to access Internet services.

Green and Shein therefore are individually liable for ACL's and Verity's violations of the FTC Act.

---

**134.** *See* PTO Ex. A. ¶¶ 29–36.

**135.** *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 573 (7th Cir.), *cert. denied,* 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989); *accord FTC v. Publ'g Clearing House, Inc.,* 104 F.3d 1168, 1170 (9th Cir.1997); *Five–Star Auto Club,* 97 F.Supp.2d at 535.

**136.** *Amy Travel Serv.,* 875 F.2d at 573.

**137.** *Id.* at 574; *accord Five–Star Auto Club,* 97 F.Supp.2d at 535.

**138.** PTO ¶¶ 22–23.

## III

The FTC seeks injunctive relief and a refund of monies paid by consumers and a disgorgement of funds reaped by defendants through their violations of the Act.

### A. Injunctive Relief

▮▮▮▮▮ The FTC asks the Court to enjoin defendants Verity, Green, and Shein from engaging in any capacity in the provision of any audiotext or videotext services to U.S. consumers. Although injunctive relief should be tailored to address specific harms and not impose unnecessary burdens on lawful activity,[139] courts may enjoin otherwise legitimate conduct in order to prevent future violations.[140]

A broad permanent injunction is warranted in the circumstances. First, defendants' fraud was calculated and substantial. Green and Shein orchestrated an elaborate scheme to cause phone bills to reflect charges for long-distance phone calls to Madagascar, when in reality those charges were for videotext services and the calls were terminated elsewhere. They preyed upon consumers' well-founded understanding that all charges on a telephone bill must be paid, regardless of whether they were authorized. Verity and ACL were the corporate vehicles they used to perpetrate the fraud.

In addition, Green and Shein have failed to show remorse for the consumer harm they inflicted. Instead, they willfully have violated this Court's orders and showed an intention to put assets taken from U.S. consumers out of the reach of U.S. authorities. The preliminary injunction that this Court entered required, *inter alia*, that defendants produce to the FTC financial statements that were needed in order to ensure the availability of funds necessary to remedy the alleged harm.[141] Green and Shein deliberately and wilfully defied the Court's order, were held in contempt, and appear to remain at large.[142] As Green and Shein are foreign business people who directed monies to be paid to overseas accounts and later refused to comply with an order to make those monies available for consumer redress,[143] any repeat of their past conduct would again result in further consumer injury that is virtually irreparable.

These circumstances lead the Court to conclude that a broad permanent injunction is necessary to prevent future violations. The Court therefore will enter an order prohibiting defendants Verity, Green, and Shein from participating in any capacity in the offering of audiotext or videotext services to U.S. consumers.

▮▮▮▮ The FTC seeks also restrictions upon ACL's billing practices similar to those contained in the preliminary injunction. Such restrictions are reasonable

---

139. *See, e.g., Soc'y for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1251 (2d Cir.1984) (citing *Hartford–Empire Co. v. United States*, 323 U.S. 386, 409–10, 65 S.Ct. 373, 89 L.Ed. 322 (1945)); *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 50 (2d Cir.1996) (citing *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir.1994)).

140. *See, e.g., Five–Star Auto Club*, 97 F.Supp.2d at 536 (defendants permanently enjoined from participating in any multi-level marketing); *FTC v. Micom*, No. 96–0472(SS), 1997 WL 226232 (S.D.N.Y. Mar. 12, 1997) (defendants permanently prohibited from engaging in business of preparing or filing government licenses).

141. *See Verity II*, 140 F.Supp.2d at 314–15.

142. *Id.* at 317 ("By withholding financial statements, Green and Shein quite deliberately and willfully are attempting to thwart efforts by the FTC to ensure that funds are available to remedy the harm they allegedly have done."). Defendant Verity belatedly complied with the FTC's requests and was not held in contempt. *Id.* at 315.

143. PX 154 ¶ 4; PX 155 ¶ 4.

measures to prevent ACL from committing future violations, similar to those in which it previously engaged. Accordingly, ACL will be enjoined from engaging in ANI-based billing of any line subscriber unless (1) the line subscriber provides express verifiable authorization agreeing to purchase and be billed for such services, or (2) the bill conspicuously contains an express statement that the line subscriber is not obliged to pay the bill unless he or she personally agreed or authorized another to agree to pay for the services for which the bill is rendered and provides a convenient method by which a line subscriber who claims not to have done so may have the bill canceled. Additionally, ACL shall be enjoined from (1) misrepresenting that line subscribers are legally obligated to pay for Internet services obtained using the ACL billing system irrespective of whether they used or authorized use of those services, and (2) misrepresenting on bills the true nature of the charges for which consumers are being billed.

## B. Monetary Relief

■ The FTC seeks restitution, consumer redress, and disgorgement of funds gained by defendants' deceptive and unfair trade practices. Section 13(b) of the Act provides that, "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."[144] Although this section does not expressly authorize courts to provide monetary relief, "courts have held repeatedly that the district court may employ the full range of equitable remedies as incident to

its power to grant injunctive relief sought by the FTC under Section 13(b)."[145] The Court therefore has broad equitable authority to grant "any ancillary relief necessary to accomplish complete justice" under this section.[146]

### 1. The AT & T Period

■ The appropriate monetary relief is the full amount lost by consumers.[147] The FTC seeks disgorgement from defendants in the amount of $16 million for payments made during the AT & T Period. Defendants concede that they do not know how much of the estimated $17.8 million paid during the AT & T Period was for videotext as opposed to audiotext. They contend, without explanation, that the amount paid may be attributed equally to videotext and audiotext. However, ACL has attributed the increase in 2000 billings to ACL's successful commercialization of its dialer billing system. The FTC contends, and the Court finds, that a reasonable approximation of the amount billed for videotext in 2000 is the difference between estimated payments in 2000 and estimated payments in 1999, or $16.3 million.[148]

The next question is the amount, if any, that should be subtracted for subscribers who actually used or authorized use of the Internet services for which they paid. The FTC concedes that some consumers who received bills actually used or authorized use of the services. The difficulty, however, is that neither party knows how many. Yet, defendants' own conduct has made it impossible to exclude these subscribers.

**144.** 15 U.S.C. § 53(b) (2004).

**145.** *Verity I*, 124 F.Supp.2d at 205–06 (collecting cases).

**146.** *Id.* at 206 (quoting *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir.1982)).

**147.** *E.g., FTC v. Febre*, 128 F.3d 530, 535–36 (7th Cir.1997); *FTC v. Medicor, LLC*, 217

F.Supp.2d 1048, 1058 (C.D.Cal.2002); *Five–Star Auto Club, Inc.*, 97 F.Supp.2d at 534.

**148.** *See Five–Star Auto Club*, 97 F.Supp.2d at 534 ("Plaintiff has the burden of showing that its calculations reasonably approximate the amount of consumers' net loss.").

Defendants employed an ANI-based billing system that did not ascertain whether subscribers had made or authorized use of the services. Where defendants' own misconduct prevents an exact determination of the amount of consumer loss, "[t]he risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty."[149] Defendants ACL, Green and Shein therefore are liable for consumer redress in the amount of $16.3 million.[150]

### 2. The Sprint Period

Turning to the Sprint Period, the FTC asserts that the appropriate monetary relief is the entire $1,616,678 million paid during that period. During the Sprint Period, all of the calls were for Internet services. Once again, defendants' own conduct makes it impossible to determine the amount paid by line subscribers who used or authorized use of the services. Accordingly, defendants ACL, Verity, Green and Shein are liable for monetary relief in the amount of $1.6 million for consumer injury caused during the Sprint Period.

### C. Other Relief

The FTC further asks the Court to impose upon defendants various reporting, monitoring, and record-keeping requirements. The Court will enter an order incorporating such relief only to the extent it is necessary to prevent future illegal conduct and not unduly burdensome.

### IV

For the foregoing reasons, plaintiff shall have judgment against defendants ACL, Green and Shein, jointly and severally, in the amount of $16,300,000. In addition, plaintiff shall have judgment against defendants ACL, Verity, Green and Shein, jointly and severally, as follows: (a) awarding to plaintiff the sum of $1,616,678, and (b) permanently enjoining defendants in accordance with this opinion. Settle judgment on three days notice. The preliminary injunction will remain in effect until the permanent injunction is entered.

Plaintiff's motion to admit additional consumer declarations and defendants' motion to admit the declaration of Robert S. Laughlin are denied as moot.

SO ORDERED.

---

**149.** *Febre*, 128 F.3d at 535 (quoting *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C.Cir.1989)); *accord Five–Star Auto Club*, 97 F.Supp.2d at 534.

**150.** The FTC's proposed order seeks monetary relief during the AT & T Period from all

of the ACL defendants, including Verity. However, the FTC has not proven Verity's involvement during the AT & T Period. Therefore, any relief with respect to the AT & T Period is limited to defendants ACL, Green and Shein.